AMERICAN CANOE ASSOCIATION,
INC. and American Littoral
Society, Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Defendants.

No. 98–979–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 18, 1998.

911

Dale R. Schmidt, Alexandria, VA, for Plaintiffs.

Sharon L. Parrish, Assistant U.S. Attorney, Alexandria, VA, for Defendants.

**MEMORANDUM OPINION**

ELLIS, District Judge.

Plaintiffs in this suit assert that the Clean Water Act (CWA) and the Endangered Species Act (ESA), in conjunction with the Administrative Procedure Act (APA), impose various nondiscretionary and discretionary duties on the United States Environmental Protection Agency (EPA) and that EPA has failed to perform these duties. In its Rule 12(b)(6), Fed.R.Civ.P., threshold dismissal motion, EPA, joined by intervenor, Virginia Association of Municipal Wastewater Agencies (VAMWA), denies that such duties exist or, alternatively, claims that EPA has fulfilled all such duties and seeks to dismiss eleven of the twelve counts brought against it. For the reasons that follow, EPA's motion is granted in part and denied in part.

## I.[1]

The American Canoe Society and the American Littoral Society (plaintiffs) are

---

1. On a motion to dismiss, the material facts alleged in the complaint are taken as true, solely

nonprofit organizations dedicated to the preservation and protection of waterways and their surrounding environments. Their membership includes individuals who fish Virginia's waters, hike and camp along Virginia's waterways, and otherwise make aesthetic and recreational use of the state's rivers, streams, and coastlines. Named as defendants are EPA, Carol Browner in her official capacity as United States EPA administrator, EPA Region III, and Michael McCabe in his official capacity as Region III EPA administrator (hereinafter collectively referred to as "EPA"). VAMWA, a membership association consisting of major municipal wastewater operators throughout Virginia, was granted leave to intervene as a defendant intervenor by Court order. *American Canoe Soc'y v. United States Envtl. Protection Agency*, C.A. 98–979–A (E.D.Va. Sept. 8, 1998).

Plaintiffs allege that their aesthetic and recreational interests in using Virginia's rivers, streams, and coastlines have been injured because EPA has failed to perform its duties under the CWA to identify Virginia's most heavily polluted waters and restore the chemical, physical, and biological integrity of those waters. They also allege that EPA's approval of various actions taken by Virginia pursuant to the CWA constitutes agency action under the ESA and, as a result, that EPA was required to consult with the Secretary of the Interior or the Secretary of Commerce to insure that such action did not jeopardize any endangered or threatened species. Plaintiffs allege this statutorily mandated consultation never occurred. Declaratory and injunctive relief is sought.

An overview of the Clean Water Act's purpose and scheme for achieving that purpose is essential to an understanding of the claims and defenses in this case. The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). The overall scheme for achieving this goal may be summarized as follows: First, the CWA provides that states must establish wa-

ter quality standards for all their waters. 33 U.S.C. § 1313(a)-(c). Next, states must assess their waters to see which waters fail to meet these water quality standards. 33 U.S.C. § 1313(d)(1). Based upon this assessment, the CWA requires states to determine the maximum amount of pollutants each body of water can receive and still meet water quality standards. *Id.* These calculations are the basis for the imposition of controls on the sources of pollution. 33 U.S.C. § 1311(b)(1)(C). When states fail to perform their duties adequately, EPA is generally required to perform them on the states' behalf. 33 U.S.C. § 1313(b), (d)(2). The following sections detail the particular statutory requirements that plaintiffs allege EPA has failed to fulfill in carrying out this CWA-mandated process.

### WQLS Submissions

Section 303(d)(1) of the CWA requires every state to identify those waters within its boundaries that do not meet, or are not expected to meet, their water quality standards even after the imposition of various enumerated controls and treatments. 33 U.S.C. § 1313(d)(1). These waters are known as "water quality limited segments" (WQLSs) and the submission from a state identifying these waters is known as a " § 303(d) submission." WQLSs must be ranked according to priority for treatment based on designated uses for the water and the severity of its impairment. 33 U.S.C. § 1313(d)(1)(A). According to regulations promulgated under § 303(d), a state's priority ranking must identify the pollutants causing, or expected to cause, violations of the water quality standards. 40 C.F.R. § 130.7. EPA regulations also require states to identify waters targeted for total maximum daily load (TMDL) [2] development in the next two years and to provide various documentation in support of their decisions to include or not to include waters on their lists of WQLSs. *Id.*

WQLSs are the starting point for the CWA's pollution regulation process, and the

---

for the disposition of the motion. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

**2.** *See* 33 U.S.C. § 1313(d)(1)(C) and discussion *infra.*

statutory schedule for promulgating WQLSs is clear and precise. Thus, Virginia's (and other states') initial § 303(d) submission was due 180 days after EPA first identified the pollutants suitable for maximum daily load calculations. 33 U.S.C. § 1313(d)(2). EPA did not complete this task until December 28, 1978, and hence Virginia's § 303(d) deadline fell on June 26, 1979. By statute, subsequent state § 303(d) submissions were due "from time to time thereafter." *Id.* This phrase is defined in EPA regulations promulgated in 1992 to mean that all states' § 303(d) submissions are due April 1 of each even-numbered year. 40 C.F.R. § 130.7(d)(1). Once a state submits its § 303(d) list of WQLSs, the CWA requires EPA to approve or disapprove the list within 30 days. 33 U.S.C. § 1313(d)(2). If the list is disapproved, EPA must then identify and prioritize WQLSs for the state within 30 days of the disapproval. *Id.*

Virginia made a § 303(d) submission of WQLSs on November 27, 1996, several months after the April 1 deadline. Virginia's § 303(d) submission does not identify all the impaired waters within Virginia, even according to Virginia's own data. Also, by its own admission, Virginia has not monitored and assessed all waters within the state. In addition, its § 303(d) submission (i) failed to identify all pollutants causing impairment of its WQLSs, (ii) failed to identify and prioritize each individual WQLS, and (iii) failed to identify waters targeted for TMDL development in the next two years. Nevertheless, EPA approved Virginia's submission on March 14, 1997, more than 30 days after it was submitted.

Virginia submitted its 1998 § 303(d) list on October 14, 1998, which was partially approved and partially disapproved by EPA on November 16, 1998.

### TMDL Submissions

In addition to requiring the identification of WQLSs, the CWA compels states to establish the total maximum daily load (TMDL) of pollutants that each WQLS can assimilate. 33 U.S.C. § 1313(d)(1)(C). A TMDL represents the highest level at which a pollutant may be "loaded" into a water body without violating water quality standards. Thus, TMDLs must be established "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality" for all pollutants that prevent or are expected to prevent the attainment of water quality standards. *Id.; see also* 40 C.F.R. § 130.7(c)(1)(ii).

To address thermal pollution, the CWA requires each state to estimate the total maximum daily thermal load (TMDTL) required to "assure protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife" in each thermally-impaired WQLS. 33 U.S.C. § 1313(d)(1)(D). To this end, the CWA sets out various considerations that must be taken into account in arriving at this estimation. *Id.*

The CWA schedule for TMDL and TMDTL submissions is essentially the same as that for WQLSs. As with the initial identification of WQLSs, Virginia was to have submitted initial TMDLs and TMDTLs to EPA by June 26, 1979, and thereafter from "time to time." 33 U.S.C. § 1313(d)(2). According to federal regulations, the deadlines for these subsequent submissions are to be determined by the EPA regional administrator and the state. 40 C.F.R. 130.7(d)(1). Also as with WQLSs, EPA must approve or disapprove a state's TMDL and TMDTL submission within 30 days, and in the event a TMDL or TMDTL is disapproved, EPA has 30 days from the date of disapproval to establish the TMDLs or estimate the TMDTLs for the state's WQLSs. 33 U.S.C. § 1313(d)(2). In the nearly twenty years that have elapsed since the 1979 deadline, Virginia has never submitted a TMDL or TMDTL for any of its waters, and EPA has never established any TMDL or TMDTL for any of Virginia's waters.

### Continuing Planning Process Requirements

Section 303(d) of the CWA requires each state to have an EPA-approved continuing planning process (CPP) for meeting the

CWA's requirements. 33 U.S.C. § 1313(e).[3] States were required to submit their CPPs for EPA approval by February 17, 1973, and EPA was required to approve or disapprove these submissions within 30 days. 33 U.S.C. § 1313(e)(2). Thereafter, states were required to resubmit CPPs "regularly," 40 C.F.R. § 130.10(b)(1), and EPA was required to review states' CPPs from "time to time" to ensure that they remained consistent with the CWA's requirements, 33 U.S.C. § 1313(2). Plaintiffs allege Virginia did not file a CPP on or before February 17, 1973, and indeed, did not do so until 1987.[4] EPA did not approve or disapprove this 1987 CPP submission, and plaintiffs allege it has never approved or disapproved any CPP for Virginia.[5]

### Endangered Species Act Requirements

Section 7 of the Endangered Species Act (ESA) requires federal agencies to consult with the Secretary of Commerce and/or the Secretary of the Interior to ensure that any action authorized, funded, or carried out by a federal agency does not jeopardize any endangered or threatened species or adversely modify the species' critical habitat. 16 U.S.C. § 1536(a)(2). This section also requires all federal agencies to "confer with the Secretary on any action which is likely to jeopardize the continued existence" of any species proposed to be listed under the ESA or destroy or adversely modify the critical habitat proposed to be designated for such species.

Plaintiffs contend that EPA's approval of water quality standards pursuant to § 303(d) of the CWA constitutes agency action under the ESA, as does EPA's approval or promulgation of WQLSs pursuant to § 303(d) of the Clean Water Act. Plaintiffs also allege that both EPA's approval and review of a CPP constitutes agency action, as does its failure to approve or review a CPP. Finally, plaintiffs contend that EPA did not follow the procedures required by the ESA and the regulations promulgated under it with regard to any of these actions.

## II.

The threshold dismissal standard is well established. A Rule 12(b)(6), Fed.R.Civ.P., dismissal for failure to state a claim is only appropriate where, assuming the complaint's factual allegations to be true and construing all inferences in favor of the plaintiff, it is clear as a matter of law that no relief could be granted. *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229; *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989). Yet, where the plaintiff colorably states facts which, if proven, would entitle him to relief, a motion to dismiss may not be granted. *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982).

## III.

Count 1 of plaintiffs' complaint is based on § 106 of the CWA. That section forbids EPA from making any grant under the Clean Water Act to any state "which has not provided or is not carrying out as a part of its program the establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, and to compile and analyze data on ... the quality of navigable waters." 33 U.S.C. § 1256(e)(1). Plaintiffs contend § 106 creates a mandatory, nondiscretionary duty that EPA has violated by making CWA grants to Virginia absent an adequate state program for monitoring and analyzing water quality. EPA responds that regardless of whether § 106(e) imposes a mandatory, nondiscretionary duty, plaintiffs lack standing to bring a claim under this section.

Constitutionally minimal standing to bring a claim requires that "[ (i) ] a plaintiff ... have suffered an actual or threatened injury in fact; [ (ii) ] the injury ... have been caused by the defendant's complained-of conduct; and [ (iii) ] the injury ... be redressable by the relief sought." *See, e.g., Friends of the Earth, Inc. v. Laidlaw Servs.,* 149 F.2d 303, 306 (4th Cir.1998). Count 1's allegations

---

**3.** Also found in the CWA are various planning requirements that must be included in a CPP. 33 U.S.C. § 1313(e)(3).

**4.** This is disputed by defendants. *See infra* note 19 and accompanying text.

**5.** Defendants dispute this as well. *See id.*

meet only the first of these three elements, falling short on causation and redressability.

■ Injury in fact follows from plaintiffs' allegations that Virginia's failure to monitor its waters injures plaintiffs by depriving them of the ability to fulfill their mission in educating the public about water quality issues in Virginia and that Virginia's failure to provide accurate information about water quality leaves plaintiffs unable to modify their behavior to avoid exposure to water pollution or to advocate measures to correct problems affecting Virginia's waters. Such an injury satisfies the constitutional minimum. *Cf. Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (holding that ecological or aesthetic harm may amount to an "injury in fact").

■ Causation is constitutionally required, as "the 'case or controversy' limitation of Art. III ... requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Count 1 is devoid of any allegations from which it can be reasonably inferred that there is any causal nexus between EPA's grants to Virginia and plaintiffs' injury in fact. Put another way, Count 1 does not allege that Virginia has failed to create water-quality monitoring systems *because* it has received CWA grants from EPA. In short, the causal nexus constitutionally required for standing is absent.

■ Absent, too, is redressability, in large part because there is no causation. Thus, the remedy sought—declaratory and injunctive relief prohibiting EPA from issuing any grants under the CWA until Virginia has an adequate water monitoring program in place—would not necessarily redress the injury. There is no reason to assume that EPA's denial of grants will force Virginia to establish an adequate water monitoring sys-

tem that would provide plaintiffs with information about the problems affecting Virginia's waters and protected species and about the steps needed to correct those problems. When, as here, redressability rests on an indirect chain of events, plaintiffs must establish that, in fact, the prospective relief will remove or remedy the harm. *See Simon*, 426 U.S. at 45, 96 S.Ct. 1917. Here, plaintiffs have pleaded no facts showing that the EPA's denial of further CWA grants for Virginia would in fact lead Virginia to establish the legally required water monitoring system. Thus, "[i]t is entirely speculative whether the desired exercise of the court's remedial powers would result in the availability to [plaintiffs] of such services." *Id.* at 42, 96 S.Ct. 1917; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding there is no standing where "it is entirely conjectural whether the nonagency activity that affects respondents will be altered or affected by the agency activity they seek to achieve"). Given plaintiffs' failure to plead facts showing that the EPA has caused their injury or that the relief they seek would redress their injury, their first cause of action must be dismissed for lack of standing.

### IV.

Counts 2 and 3 may be analyzed together as both rest on the allegation that EPA failed to perform a duty imposed by § 303(d)(2) when it approved Virginia's allegedly inadequate 1996 § 303(d) list of WQLSs. Count 2 claims this agency action violated the CWA, whereas count 3 claims this act and the failure to establish a proper WQLS list were abuses of discretion that violated APA section 706(2)(A) and (C) and section 706(1).

■ Although counts 2 and 3 are not explicitly styled alternative causes of action, there is no doubt that they must be so, for duplicative causes of action cannot lie under both the Clean Water Act and the Administrative Procedure Act.[6] This principle follows

---

6. *See Oregon Natural Resources Council v. United States Forest Serv.*, 834 F.2d 842, 851 (9th Cir. 1987) ("Where the plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit require-

ments of the [CWA] established by Congress through resort to ... the APA."); *Allegheny County Sanitary Auth. v. United States Envtl. Protection Agency*, 732 F.2d 1167, 1177 (3d Cir. 1984) ("The Water Pollution Control Act pro-

from the APA itself, which in § 704 makes reviewable only agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

EPA's threshold attack on the claims asserted in counts 2 and 3 is that they are moot given that Virginia's 1998 WQLS list, expected imminently when the suit was filed, has since issued and been partially approved and partially disapproved by EPA. Plaintiffs respond that because a new § 303(d) list of WQLSs is submitted every two years, the mootness doctrine is inapplicable, as there is too short a time to complete legal proceedings challenging one list before a new list is issued, and hence these counts present an issue capable of repetition, yet evading review. If this response is factually valid, there is no mootness, for it is settled that a court may hear a case that does not present a live controversy when "two conditions exist: (1) the challenged action must be in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subject to the same action again." *Kennedy v. Block,* 784 F.2d 1220, 1223 (4th Cir.1986). Were the rule otherwise, some inherently short-lived controversies would escape judicial review. *Id.* at 1222.

■ EPA and plaintiffs dispute whether two years is a duration too short to litigate the deficiencies of any § 303(d) list proffered by Virginia fully. In point of fact, the time available for review of the new 1998 list appears to be less than two years. EPA partially approved and partially disapproved Virginia's § 303(d) list on November 16, 1998. Presumably, by December 16, 1998, EPA will publish its own list of waters to be

added to Virginia's § 303(d) list, as required by statute. According to federal regulations, Virginia must submit its year 2000 § 303(d) list by April 1, 2000. This leaves only sixteen and a half months for judicial review of EPA's partial approval of Virginia's § 303(d) list and fifteen and a half months for judicial review of EPA's list of additional waters. Yet, as plaintiffs point out, even this calculation overstates the available time for review of a claim brought under the citizen suit provision of the CWA, since this provision requires plaintiffs to give EPA 60–day notice of any action brought under it. *See* 33 U.S.C. § 1365(b). Thus, assuming plaintiffs immediately received and reviewed the relevant materials and then sent an intent-to-sue letter the following day, they could not challenge EPA's partial approval of the list until January 16, 1999, or EPA's own promulgated list until February 15, 1999. This would leave only fourteen and a half months to review the former action and thirteen and a half months to review the latter.

Such brief spans of time have repeatedly been recognized to be too short to permit full litigation of a matter. Significantly, *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), the Supreme Court case that introduced the "capable of repetition yet evading review" exception to the mootness doctrine, applied this exception to permit review of an ICC order valid for only two years. *Id.* at 514, 31 S.Ct. 279. Since *Southern Pacific,* courts have routinely found that the exception encompasses challenged action or events, which by their nature are only several months to one or two years in duration or effect.[7]

---

vides an adequate remedy for plaintiff in the circumstances here.... [Thus,] preclusion of the APA remedy is proper."); *Environmental Defense Fund v. Tidwell,* 837 F.Supp. 1344, 1356 (E.D.N.C.1992) ("[I]f a plaintiff can bring suit against the responsible federal agencies under the CWA, this action precludes an additional suit under the APA.").

**7.** *See, e.g., Sosna v. Iowa,* 419 U.S. 393, 400, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (indicating that challenge of a one-year durational residency requirement evaded review since a single year was not enough time to see a lawsuit challenging the

requirement to conclusion); *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 126, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (noting that "elections spaced at yearlong or biennial intervals ... should not preclude challenge to state policies that have had their impact and that continue in force, unabated and unreviewed"); *Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 63 (4th Cir.1989) (finding suit seeking to unseal affidavit not moot when affidavit was unsealed within eight months of plaintiff's petition since such secrecy orders are usually too short to be litigated fully).

Arguing to the contrary, EPA relies upon *Idaho Department of Fish and Game v. National Marine Fisheries Service*, 56 F.3d 1071 (9th Cir.1995), for the proposition that the 1996 § 303(d) list is not reviewable. There, a Ninth Circuit panel held that a when a 1994–1998 biological opinion (BO) had issued pursuant to the Endangered Species Act, superseding a 1993 biological opinion, the case challenging the 1993 opinion was moot, since "[t]he life-span of the 1994–1998 BO, even considering the year that [had] already passed, [was] more than enough time for litigants to obtain judicial review." *Id.* at 1075. Put simply, the difference between that case and this one is the difference between a three to four year period and a period of just over one year. The former may offer sufficient time to ensure that judicial review can be obtained; the latter plainly does not. Thus, the challenged action here—the submission of § 303(d) list—has too short a life to be fully litigated prior to its supersession by the next § 303(d) list.

The second half of the mootness analysis is less clear; it is not immediately apparent whether there is a reasonable expectation that plaintiffs will be exposed to the same action again, namely, whether EPA's treatment of the 1998 § 303(d) list will suffer from the same alleged inadequacies as its treatment of the 1996 § 303(d) list. Indeed, inasmuch as EPA has partially disapproved the 1998 list, while it approved the 1996 list *in toto*, potentially significant differences seem already to have emerged in either Virginia's listing criteria or EPA's review of Virginia's list, or both. Neither party has pointed to any intervening legislation or regulation that would alter EPA's standard of review of Virginia's § 303(d) list in 1998 as compared to 1996. EPA, however, has pointed to changes in Virginia's water quality assessment methods in 1998 resulting from new EPA guidance. These changes raise the possibility that Virginia's water quality assessment methods have changed in ways that will rec-

tify at least some of the inadequacies plaintiffs complain of in regard to the 1996 list.

█ In the circumstances, a proper assessment of whether there is a reasonable expectation that the deficiencies complained of will recur requires the following: First, the 1996 § 303(d) submission must be compared with the 1998 submission to identify (i) those complained-of deficiencies that have been remedied and (ii) those that have not. As to the latter category, it is readily apparent that the 1998 § 303(d) list does not moot counts 2 and 3 as these alleged deficiencies have in fact recurred and there is, therefore, a reasonable expectation that they will continue to recur. It follows, then, that this category of alleged deficiencies is not rendered moot by the 1998 submission and should be reviewed under counts 2 and 3 as they appear in the 1996 § 303(d) submission.[8]

█ A more subtle analysis is necessary to determine whether it is reasonable to expect the recurrence of any of the alleged deficiencies that have been remedied in the 1998 § 303(d) list. The mere fact that the alleged deficiency did not recur in the 1998 submission is, by itself, some evidence that it will not recur, but it is not conclusive evidence of this. The key to determining whether recurrence of an alleged deficiency in the 1996 submission that is absent for the 1998 version is likely requires an examination of (i) the alleged deficiency, (ii) the manner in which it has been remedied, and (iii) EPA's position on the matter. Thus, there seems little likelihood of recurrence where EPA concedes the existence of the alleged deficiency in the 1996 submission, demonstrates that it has been remedied, and represents that there is no intention to repeat the deficiency. In this event, there is no good reason to litigate the 1996 deficiency; it is plainly moot.

At the other end of the continuum is the situation where there is some ambiguity, both as to whether the alleged deficiency has been remedied and as to whether EPA con-

---

8. Should the 1998 list contain inadequacies different from those found in the 1996 list, plaintiffs may initiate a new action concerning these inadequacies after complying with the statutorily prescribed 60–day notice period for any citizen suits brought under the CWA. Alternatively, plaintiffs may seek to amend their complaint to include these claims pursuant to Rule 15, Fed.R.Civ.P., following the 60–day notice period, if applicable.

cedes either that it is a deficiency or that it will not recur. In this event, the alleged deficiency in the 1996 submission may well not be rendered moot by the 1998 submission. The order accompanying this memorandum opinion will require the parties to address these matters through further briefing.

■ Assuming that counts 2 and 3, at least in part, are not mooted, it is necessary to consider EPA's claim that it has no duty to reach a particular result in reviewing Virginia's § 303(d) list of WQLSs and thus its approval of Virginia's 1996 list cannot violate the CWA or constitute an abuse of discretion reviewable under the APA. In this respect, EPA is simply wrong. EPA's own regulations state that the "Administrator shall approve a list developed under [40 C.F.R.] § 130.7(b) that is submitted after the effective date of this rule *only if* it meets the requirements of § 130.7(b)." 40 C.F.R. § 130.7(d)(2) (emphasis added). Section 130.7(b) sets out the requirements for state identification of water-quality limited segments still requiring TMDLs—in other words, § 303(d) lists. This section requires states to identify the WQLSs within their boundaries that still require TMDLs and that will not meet water quality standards even after various enumerated pollution control requirements are imposed or that will not protect indigenous shellfish, fish, and wildlife even after various enumerated thermal discharge limitations are imposed. The regulation requires states to rank these WQLSs according to priority, taking into account the severity of the pollution and the uses to be made of the water. It also requires states (i) to identify the pollutants causing or expected to cause violations of water quality standards and (ii) to identify specifically those waters targeted for TMDL development in the next two years. Further, § 130.7(b) requires states to assemble and evaluate all existing and readily available water quality-related data in developing this list and provides examples of the sorts of data a state should consider. Finally, this section requires a state to provide certain specified documentation to EPA in support of its decision to list or not to list its waters. Virginia submitted its 1996 § 303(d) list after the effective date of this regulation.

Plaintiffs' complaint alleges that Virginia's 1996 § 303(d) list (i) does not identify all WQLSs in the state; (ii) does not identify various enumerated waters as impaired despite the fact that the data Virginia was by regulation required to assemble and evaluate in the creation of its § 303(d) list identify such waters as impaired; (iii) does not identify and prioritize each individual WQLS; (iv) does not identify all pollutants causing impairments of its WQLSs; (v) does not identify waters targeted for TMDL development in the next two years; and (vi) does not provide supporting documentation for its determination not to identify certain waters as WQLSs. Plaintiffs thus clearly allege that EPA approved the 1996 § 303(d) list in direct violation of its own imperatively phrased regulations. The regulation cannot be read as anything other than mandatory; it sets out a list of required elements for state § 303(d) submissions and states that the administrator "shall" only approve a list that includes all required elements. When the word "shall" appears in a statute, it is generally construed as mandatory, leaving no room for agency discretion.[9] Nothing in the language of the regulation or the Clean Water Act suggests that "shall" should be read otherwise here.

■ The decision whether to approve or disapprove an agency's § 303(d) submission appears to be a discretionary one, and so not reviewable under the citizen suit provision of the Clean Water Act, which only permits challenge of "any act or duty under this chapter which is not discretionary" with EPA. 33 U.S.C. § 1365(a)(2). The statutory language does not place explicit restrictions upon the Administrator's authority to approve or disapprove states' submissions, but simply requires that a decision be made. 33 U.S.C. § 1313(d)(2). Thus, the substance of the decision ultimately appears to be discre-

---

9. *See, e.g., Reid v. Kayye,* 885 F.2d 129, 131 n. 1 (4th Cir.1989) ("Use of the word 'shall' generally indicates a mandatory intent.").

tionary with EPA rather than mandated by the terms of the statute. Nevertheless, discretion does not permit agencies to disregard their own regulations.[10] In such an instance, a party may bring suit under § 706 of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). Thus, plaintiffs' count 3 survives, as they have properly alleged an abuse of discretion by the EPA.

If EPA is ultimately found to have acted arbitrarily and capriciously in approving Virginia's § 303(d) submission in violation of its own regulations, the appropriate remedy may be to enter an order requiring EPA to disapprove Virginia's submission pursuant to EPA's regulations. When EPA, in response to this order, disapproved the list, it would then have a nondiscretionary duty under the CWA, enforceable by the CWA's citizen suit provision, to establish WQLSs for Virginia within 30 days of the date of disapproval. Count 2, therefore, survives to the extent necessary to require EPA to fulfill this duty. Thus, the motion to dismiss counts 2 and 3 must be denied to the extent that the alleged deficiencies in the 1996 submission have not been rendered moot, as discussed herein, by Virginia's 1998 submission.

## V.

■ Count 4 alleges that EPA has failed to establish TMDLs and TMDTLs for Virginia's waters, as required by the Clean Water Act. 33 U.S.C § 1313(d)(1)(C). Defendants contend count 4 must be dismissed for lack of subject matter jurisdiction because EPA does not have a mandatory, nondiscretionary duty to establish TMDLs or TMDTLs in the face of inaction by a state. Under EPA's reading of the statute, its duty to approve or disapprove TMDLs and TMDTLs and promulgate its own lists in the event of disapproval is triggered only by the states' sub-

mission of TMDL and TMDTL lists. In EPA's view, inaction by states, for however long a period, imposes no duty on EPA. Further, EPA states that when Congress wishes to impose a nondiscretionary duty on EPA to act in the face on state inaction, it does so explicitly, as it has done elsewhere in later-enacted portions of the CWA. See, e.g., 33 U.S.C. 1314(1), (3). Plaintiffs respond that Virginia's failure to submit its TMDL and TMDTL lists by the 1979 deadline or in the nearly twenty years following constitutes a constructive submission that no TMDLs or TMDTLs are required for the state's water, which the CWA compels EPA to disapprove as inadequate.

The leading case addressing the subject is *Scott v. City of Hammond,* 741 F.2d 992 (7th Cir.1984). In *Scott,* plaintiff brought suit against the EPA for its failure to promulgate TMDLs for pollutants discharged into Lake Michigan when Illinois and Indiana did not submit lists by the 1979 deadline or in the years following. The Seventh Circuit concluded that "if a state fails over a long period of time to submit proposed TMDL's, this prolonged silence may amount to the 'constructive submission' by that state of no TMDL's," which EPA would then be under a duty to approve or disapprove. *Id.* at 996. In this regard, the court suggested that given the short statutory deadlines, the states' prolonged silence were properly characterized as a "refusal to act," and thus as a constructive submission that no TMDLs were necessary. *Id.* at 998. The possibility that Congress did not intend EPA to establish TMDLs if the states chose not to act was dismissed, with the court noting,

> We think it unlikely that an important aspect of the federal scheme of water pollution control could be frustrated by the refusal of states to act. This is especially

---

**10.** *See Executive Bus. Media v. U.S. Dep't of Defense,* 3 F.3d 759, 762 (4th Cir.1993) ("In general, even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency ... failed to follow its own regulations."); *Garcia v. Neagle,* 660 F.2d 983, 988 (4th Cir.1981) ("Where the controlling statute indicates that particular agency action is committed to agency discretion, a court may review the action if there is a claim that the agency has violated constitu-

tional, statutory, regulatory or other restrictions."). "When the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review." *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 874 (D.C.Cir.1970). "The regulations of [an agency] have the force of law.... When a prima facie showing of the violation of those regulations has been made the agency may not be heard to say that the matter in question has been left to its discretion." *Id.* at 874–75.

true in light of the short time limits both on a state's action, and on the EPA's required reaction to the state submissions, with respect to promulgation of TMDLs. *Id.* at 997.

With one exception, every court that has considered the issue has followed *Scott.*[11] The one divergent decision is the recent opinion in *Natural Resources Defense Council, Inc. v. Fox*, 30 F.Supp.2d 369 (S.D.N.Y. 1998). *Fox* holds that EPA's decision as to when to deem a state's inaction a "constructive submission" is itself discretionary, and so is not enforceable under the citizen suit provision of the CWA. The *Fox* court concluded that judicial imposition of any deadline upon EPA for construing a state's inaction as a "constructive submission" would necessarily be premised only by inference from the deadlines in the statute, and that even if such an inference were plausible, it would be unwarranted as it would unduly limit EPA's flexi-

bility in addressing TMDL compliance. *Id.* at 382–83.

Under EPA's theory of the case, which generally anticipates the reasoning in *Fox*, *Hammond* and the cases following it have erred by failing to recognize that a statute creates a nondiscretionary, judicially-enforceable duty only when it provides a date-certain deadline for agency action. *See Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C.Cir. 1987).[12] Here, EPA alleges, no date-certain deadline exists. Thus, the reasoning goes, no mandatory duty to approve or disapprove the "constructive submission" can be imposed upon the EPA because such a duty is unworkable, since it is impossible to define with precision when a state's constructive submission has occurred and when the EPA's 30–day clock for approval or disapproval of that submission begins running.

Assuming, *arguendo*, that EPA is correct in asserting that a duty under the CWA

11. For example, in *Alaska Center for the Environment v. Reilly*, 762 F.Supp. 1422, 1429 (W.D.Wash.1991), the district court noted that § 303(d) required the EPA to step into the states' shoes when their TMDL submissions were inadequate and concluded that the " 'inadequacy' of a submission includes deliberate, silent inaction." Thus, the court held that EPA had a mandatory duty to promulgate TMDL lists upon Alaska's eleven-year failure to submit TMDLs to the EPA. This holding followed from the court's observation that it was "improbable, and unsupported by case law, that if the states default, Congress intended their roles [in water pollution control] would remain unfulfilled.... [I]t is unlikely that Congress intended an important aspect of the federal water pollution control scheme to be frustrated by the failure of a state to act." *Id.* at 1429. *See also Hayes v. Browner*, No. 97–CV–1090 (and consolidated cases), slip op., at 7 (D.Okla. October 30, 1998) ("[A] state's failure to submit TMDLs over a prolonged period may amount to a constructive submission which then triggers a mandatory duty on the part of the EPA administrator to either approve or disapprove the constructive submission."); *Sierra Club v. Hankinson*, 939 F.Supp. 865, 868 (N.D.Ga.1996) ("If a state fails to submit a WQLS list or TMDL determinations over a long period of time, this prolonged failure may amount to the 'constructive submission' by that state of no WQLS list or TMDLs, thus triggering EPA's mandatory duty to approve or disapprove of the constructive submissions and, upon disapproval, to promulgate a WQLS list or TMDL determinations."); *Sierra Club v. Browner*, 843 F.Supp. 1304, 1312 (D.Minn.1993) ("The Act would be ineffective if a state's refusal to act would not trigger any EPA

action. A state's failure to develop adequate TMDLs should not thwart Congress' purposes in drafting Section 303(d). The Administrator's duty to act following prolonged state inaction is therefore mandatory, not discretionary."); *cf. Miccosukee Tribe v. United States*, 105 F.3d 599, 601 (11th Cir.1997) (applying § 303(d) of the CWA regarding state promulgation of water quality standards and concluding that "[e]ven if a state fails to submit new or revised standards [to the EPA], a change in state water quality standards could invoke the mandatory duty imposed on the Administrator to review new or revised standards").

12. *Sierra Club v. Thomas* considered whether a district court could enforce a duty of timeliness against the EPA under the Clean Air Act when that duty was imposed by a deadline that was not readily ascertainable, but instead existed "only as the product of a set of inferences based upon the overall statutory scheme." *Id.* at 791. The *Thomas* court concluded that in order to impose a clear-cut, judicially enforceable, nondiscretionary duty of timeliness, a statute must mandate that all specified action be taken by a date-certain deadline. As the court noted, "In the absence of a readily-ascertainable deadline, ... it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a categorical mandate that deprives it of all discretion over the timing of its work." *Id.* The court emphasized, however, that such a date-certain deadline may exist, even if not explicitly set forth in the statute, if a deadline is readily-ascertainable by reference to a fixed date or event. *Id.* at 791 n. 58.

cannot be nondiscretionary unless it is fixed in time,[13] the CWA appears to offer such a readily-ascertainable deadline. Under *Sierra Club v. Thomas*, a deadline need not be explicitly set out in a statute if it is readily ascertainable by reference to a fixed time or event. *See* 828 F.2d at 791 n. 58. This is the case here, as the CWA provides that state TMDL and TMDTL lists must be submitted to the EPA no later than 180 days after EPA's publication of its first water pollutants list (June 26, 1979); that EPA must approve or disapprove the submissions within 30 days after that (July 26, 1979); and that if disapproved, the EPA must promulgate its own TMDL and TMDTL lists within 30 days (August 25, 1979). 33 U.S.C. § 1313(d)(2). The deadline for EPA's approval or disapproval of state submissions would appear to be July 26, 1979. It is not obvious that plaintiffs would have succeeded if they had brought suit in August of 1979, alleging that EPA had violated the CWA by its failure to act, but this is not because of the absence of a statutory deadline. This is because EPA might well have argued persuasively at that time that Virginia's failure to meet the June 26, 1979, deadline should not be construed as a constructive submission that no TMDLs were necessary, but rather should be understood as a reasonable delay. The strength of this argument varies inversely with the passage of time. In any event, it seems plaintiffs would have had a prima facie claim against the EPA sufficient to survive a motion to dismiss by late 1979, although at that point EPA may have persuaded a court, on the merits, to allow more time. In sum, EPA's argument that the CWA offers no readily ascertainable deadline for its performance of the duty that plaintiffs here assert must fall before the language of the statute.

In the final analysis, the most compelling reason to follow *Scott* and its progeny is that EPA's alternative interpretation of the statute would allow recalcitrant states to short-circuit the Clean Water Act and render it a dead letter. The structure and purpose of the CWA, coupled with the mandatory tone Congress adopted throughout § 303, counsel against such a reading. It seems highly likely that Congress intended that EPA should be required to act not only when states promulgate lists that fail to meet the standards set forth in § 303, but also when states completely ignore their mandatory statutory responsibilities and fail to promulgate any list at all.[14]

 EPA further contends that the doctrine of ripeness compels the conclusion that before pursuing a judicial claim concerning

---

13. It is not clear whether EPA's violation of an express statutory deadline is a necessary prerequisite to jurisdiction over a citizen suit brought under the CWA. *See National Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1129 n. 6 (D.C.Cir. 1997) (citing *Thomas* and declining to decide whether a "readily ascertainable deadline" for agency action is a necessary jurisdictional basis for a citizen suit under the Clean Water Act); *Miccosukee Tribe v. EPA*, 105 F.3d 599 (11th Cir.1997) (finding EPA violated mandatory, nondiscretionary duty under the CWA though no violation of a readily ascertainable statutory deadline was shown); *Raymond Proffitt Found. v. United States Envtl. Protection Agency*, 930 F.Supp. 1088, 1098 (E.D.Pa.1996) (holding that date-certain rule did not apply in CWA cases because the rule originally was developed to resolve an issue under the bifurcated jurisdictional scheme of the Clean Air Act, while the CWA poses no analogous jurisdictional problem and because application of the rule would lead to a result inconsistent with the goals of the CWA); *Cross Timbers Concerned Citizens v. Saginaw*, 991 F.Supp. 563, 568 (N.D.Tex.1997) (questioning whether *Thomas* date-certain rule applies in CWA cases).

14. Intervenor points out that under Fourth Circuit precedent, when a statute is silent on the existence or nonexistence of a nondiscretionary duty, a court must defer to the agency's reasonable interpretation of the statute in determining whether any such duty exists. *See Monongahela Power Co. v. Reilly*, 980 F.2d 272, 279 (4th Cir. 1992) ("Where, as here, however, Congress' silence gives rise to ambiguity as to its wishes, the administering agency is not required to adopt any particular interpretation from among the plausible alternatives; it need only demonstrate that the interpretation it advances is reasonable."). The short answer to this proposition is that the interpretation that EPA here advances is neither a plausible nor a reasonable one given the purpose and structure of the statute. The statute requires that EPA undertake states' duties if the states fail to fulfill them adequately. It is simply not plausible that Congress intended that when the states partially fail to fulfill their CWA duties EPA must step in, but when they completely fail to fulfill these duties, EPA is free to stand idly by, rendering the CWA meaningless.

EPA establishment of TMDLs and TMDTLs, plaintiffs should, pursuant to the APA,[15] petition the agency to take the requested action, allowing the agency to decide whether or not to act on that petition in the first instance. A brief examination of the ripeness doctrine serves to rebut EPA's argument.

The ripeness doctrine "generally prevents courts from becoming entangled in abstract disagreements over agency policy and from improperly interfering in the administrative decisionmaking process." *Natural Resources Defense Council v. Environmental Protection Agency*, 22 F.3d 1125, 1133 (D.C.Cir.1994). In determining ripeness, courts address both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Id.*, citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The Fourth Circuit has clarified that a case is fit for judicial decision "where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final." *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir.1992). The Fourth Circuit has also held that while a formal administrative order generally is characteristic of final action, its presence is not a prerequisite to finality sufficient for judicial review. *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 667 (4th Cir.1997).

Here, the appropriate remedy for the plaintiffs' TMDL and TMDTL complaints would appear to be an order directing EPA to approve or disapprove Virginia's constructive submission within 30 days and, if the submission is disapproved, to proceed to promulgate its own lists. Plaintiffs are not asking the Court to weigh and balance fine policy considerations, but rather seek only a determination whether EPA violated its statutory deadlines and, if so, an order requiring EPA to render a decision. This inquiry seems quite fit for judicial decision. If resolution of the issue is pushed further into the future, plaintiffs' injury will continue to accrue, while immediate resolution of the question would seem to work no discernable injury upon defendants. On the other hand, EPA's contention that plaintiffs must petition it to fulfill a duty in which it has been derelict for almost twenty years is disingenuous. One suspects at this point that it would be as fruitful to ask Miss Havisham to put aside her wedding clothes as it would be to request EPA to turn its attention to Virginia's TMDLs. Directing plaintiffs to the EPA for relief that lies solely within the agency's discretion is inappropriate given EPA's long avoidance of its duty under the CWA.[16]

In short, none of EPA's arguments in support of dismissal of claim 4 succeed.[17] Since

**15.** "So far as the orderly conduct of public business permits, an interested person may appear before an agency or its responsible employees for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding ... in connection with an agency function." 5 U.S.C. § 555(b).

**16.** Intervenor also attempts to require plaintiffs to tender a § 555(b) petition: it argues that until plaintiffs have submitted such a petition, they have failed to exhaust administrative remedies and so are barred from seeking judicial review. Given the plaintiffs' compliance with the 60–day notice provision, which gave EPA actual notice of the claims and time in which to act upon them, they have exhausted all administrative procedures required or available under the Clean Water Act. As the Third Circuit put it, "Under the plain language of [the CWA], the district courts should defer [to administrative agency action] for sixty days, and at that point determine whether or not the violation has been halted by administrative action or otherwise. If it has not been so

halted, the citizen's suit goes forward. It does not wait in what may be a perpetual limbo while the agency decides whether or not to take action." *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 244 (3d Cir.1980). Requiring plaintiffs to enter this limbo through filing of a § 555(b) petition would sharply undermine the function and purpose of the 60–day notice provision.

**17.** EPA also argues that count 4 improperly seeks to use the CWA citizen suit provision to require EPA to reach a specific decision, *i.e.*, the disapproval of Virginia's constructive submission that no TMDLs are necessary. Whether or not this contention is correct, it appears merely to address remedy. The proper relief under count 4 would appear to be an order that EPA approve or disapprove Virginia's "constructive submission" within 30 days. If the EPA approved the submission, this would appear to be a final agency action which could be challenged for abuse of discretion under the Administrative Procedure Act.

claim 4 survives, claim 5, pleading in the alternative that EPA's failure to act is an abuse of discretion reviewable under the Administrative Procedure Act, must be dismissed.[18]

## VI.

Count 6, brought under the citizen suit provision of the CWA, alleges that EPA's failure either to approve or disapprove Virginia's CPP and thereafter review it from time to time constitutes a failure to perform a mandatory, nondiscretionary duty under the CWA. EPA contends that count 6 fails to state a claim upon which relief can be granted because EPA actually approved Virginia's CPP on September 12, 1973. This contention, however, raises a dispute of fact that is not resolvable on a motion to dismiss.[19] EPA further argues that it has no nondiscretionary duty to review the CPP since the statute's requirement that the CPP be reviewed "from time to time" clearly leaves the timing of reviews to agency discretion. This appears to be true, as courts have generally held that use of the phrase "time to time" does not create a nondiscretionary administrative duty. *See Natural Resources Defense Council v. Thomas*, 885 F.2d 1067, 1075 (2d Cir.1989); *Natural Resources Defense Council v. United States Envtl. Protection Agency*, 770 F.Supp. 1093, 1105 (E.D.Va.1991), *aff'd* 16 F.3d 1395 (4th Cir. 1993).[20] Accordingly, count 6 must be dismissed to the extent that it attempts to enforce this discretionary duty of review.

But this does not end the analysis. Section 303(e) of the CWA clearly sets out a mandatory initial duty to approve or disapprove a state's initial CPP. The statute requires each state to submit a CPP not later than 120 days after October 18, 1972, which EPA must either approve or disapprove within 30 days. 33 U.S.C. § 1313(e). Since plaintiffs allege EPA has never approved or disapproved a CPP for Virginia, although the initial deadlines for submission and approval passed in 1973 and although Virginia submitted a proposed CPP in 1987, they have stated a claim of violation of a nondiscretionary duty sufficient to survive a motion to dismiss. Thus, Count 6 survives to the extent that it alleges EPA has never approved or disapproved a CPP for Virginia. Of course, should the record ultimately disclose that Virginia submitted an initial CPP in 1973 and that EPA approved it, then EPA will prevail on count 6 as EPA has no mandatory, nondiscretionary duty to act on any CPP other than the initial one.

## VII.

Count 7, brought under the citizen suit provision of the Clean Water Act, alleges that EPA has failed to perform a mandatory, nondiscretionary duty to disapprove Virginia's proposed 1987 CPP. EPA states that count 7 should be dismissed because § 303(e) only requires it to approve or disapprove an *initial* CPP, while thereafter the statute simply provides that the Administrator shall review a state's planning process, without im-

---

**18.** *See supra* note 6.

**19.** *See, e.g., Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir.1989) (noting that a court must assume the truth of pleaded facts on a Rule 12(b)(6) motion to dismiss).

**20.** Plaintiffs rely upon *Raymond Proffitt Foundation v. United States Environmental Protection Agency*, 930 F.Supp. 1088 (E.D.Pa.1996), for the proposition that recurring duties tied to a fixed date to complete a mandatory duty are themselves nondiscretionary. *Proffitt* considers 33 U.S.C. § 1313(c)(4), which requires EPA to "promptly prepare and publish" regulations setting out a new water quality standard when a state fails to adopt changes specified by EPA within a certain time frame. The district court held that the framework of § 1313(c), which sets out precise deadlines for state submission of re-

vised water quality standards, EPA review of the revised standards, notification of states by EPA of required changes to the standards, and state adoption of these changes, enabled the court to infer a reasonable time frame within which the EPA must "promptly" act. *Id.* at 1099. In such circumstances, the court reasoned, the "inferable deadline" "gives rise to the same nondiscretionary duty—albeit, somewhat more of a moving target—than a 'date-certain' or 'bright-line' deadline imposes." *Id.* at 1100. Section 1313(e) is not analogous to § 1313(c), in that it does not set out any timeline from which a deadline for review of CPPs can be inferred. Its fixed deadline for submission of initial CPPs sheds no illumination upon the time frame for periodic review imagined by the statute. Thus, *Proffitt* is inapposite.

posing any requirement of EPA approval or disapproval. 33 U.S.C. § 1313(e). EPA seems here to assume that Virginia's initial CPP was submitted and approved in 1973, but as noted, that is an issue of disputed fact and for purposes of resolving a motion to dismiss, the facts alleged in the complaint are taken as true.[21] If we accept for the purposes of this motion that Virginia's initial CPP was submitted in 1987, then the CWA requires EPA to approve or disapprove this submission within 30 days. Section 303(e) of the CWA states that the Administrator "shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such state, which include, but are not limited to" various enumerated components. 33 U.S.C. § 1313(e)(3). Plaintiffs argue that since Virginia's 1987 CPP did not include many of these components, EPA had a non-discretionary duty to disapprove it. While this provision clearly imposes a duty upon the EPA to *approve* a proposed CPP that includes various enumerated elements, by its plain language it imposes no complementary duty to *disapprove* a CPP that does not include these elements. Thus, it does not establish a mandatory, nondiscretionary duty enforceable under the citizen suit provision of the CWA, and so count 7 must be dismissed.

## VIII.

Count 8, brought under the citizen suit provision of the CWA, alleges that EPA has failed to perform its mandatory, nondiscretionary duty to revoke Virginia's Title IV NPDES permitting authority in the absence of an approved CPP for Virginia. *See* 33 U.S.C. § 1313(e)(2) (stating the Administrator shall not approve any Title IV permitting program for a state unless the state has an approved CPP). EPA states that count 8 should be dismissed because § 509(b)(1)(D) of the CWA vests jurisdiction over EPA determinations concerning state NPDES permit programs exclusively in the Courts of Appeals. 33 U.S.C. § 1369(b)(1)(D). Specifically, this section provides that the Courts of Appeals shall review EPA actions "making

any determination as to a State permit program under section 1342(b) of this title," while section 1342(b) sets out the process by which states' NPDES permit programs are approved by EPA. In count 8, plaintiffs claim in essence that EPA approved Virginia's NPDES permitting program in violation of the law. This claim plainly falls within the broad language of § 509(b)(1)(D), which vests exclusive jurisdiction over review of "*any* determination as to a state permitting program" in the Court of Appeals (emphasis added). As a result, count 8 must be dismissed for lack of subject matter jurisdiction.

## IX.

Count 9 of plaintiff's complaint seeks review of the EPA actions described in counts 6, 7, and 8 under § 706(1) and § 706(2)(a) of the APA, alleging that these actions either constitute an unlawful withholding of, and an unreasonable delay of, agency action or that these actions are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. EPA contends this count should be dismissed because of multiple jurisdictional defects. As discussed above,[22] plaintiffs may not maintain duplicative causes of action under the CWA and the APA, and hence that portion of count 9 challenging EPA's failure to approve or disapprove Virginia's initial CPP within the statutorily mandated time period must be dismissed. For the jurisdictional reasons set out above,[23] that portion of count 9 relating to EPA's approval of Virginia's NPDES system must also be dismissed. Nevertheless, several claims remain for analysis.

Just as plaintiffs cannot pursue any claim that EPA has failed to review Virginia's CPP from "time to time" under the citizen's suit provision of the CWA, so also it cannot sustain such a claim under the APA. Section 701(a)(2) provides that agency action "committed to agency discretion by law" is not reviewable under the APA. 5 U.S.C. § 701(a)(2). This exception, which exists in

21. *See supra* note 1.

22. *See supra* Part IV.

23. *See supra* Part VIII.

uneasy tension with § 706(2)(a)'s provision for judicial review of agency action for abuse of discretion, is a narrow one. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Electricities of N.C., Inc. v. Southeastern Power Admin.,* 774 F.2d 1262, 1266 (4th Cir. 1985). The exception "applies only in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Electricities,* 774 F.2d at 1266. This is such a rare case. It is impossible to know what interval "time to time" is meant to represent and what considerations control the timing of this intermittent review.[24] Thus, the timing of these reviews is committed solely to agency discretion and there is no law for a reviewing court to apply. *Cf. Electricities,* 774 F.2d at 1266 (holding that the Flood Control Act's requirement that the Secretary of Energy distribute power produced at federal dams "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles" was too vague to provide a standard by which a court could review the agency's decisions, since the phrase "most widespread use" was susceptible to a variety of interpretations).

 Plaintiffs also seek review of EPA's failure to disapprove Virginia's 1987 CPP, claiming that this failure is an unlawful delay or withholding of agency action reviewable under 5 U.S.C. § 706(1) and that if EPA alleges that it has in fact approved the 1987 CPP, that approval was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law and is reviewable under 5 U.S.C. § 706(2)(A). If EPA did approve the 1987 CPP, and if it did so any time in 1987 or the four and a half years following, plaintiffs are time-barred from challenging this approval as arbitrary and capricious. The statute of limitations for actions challenging agency action under the APA is six years. *See, e.g., Sierra Club v. Slater,* 120 F.3d 623, 631 (6th Cir.1997) ("It ... appears beyond question that the six-year statute of limitations of [28 U.S.C. § 2401(a) ] applies to actions brought pursuant to the APA.") Thus, this portion of count 9 must also be dismissed.

 Plaintiffs § 706(1) claim of unreasonable or unlawful delay is not time-barred, however, since application of a statute of limitations to a claim of unreasonable delay is grossly inappropriate, in that it would mean that EPA could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years. *Cf. Natural Resources Defense Council v. Fox,* 909 F.Supp. 153, 159 (S.D.N.Y.1995) (applying the same rationale to conclude that no statute of limitations applies to actions brought under the CWA citizen suit provision challenging EPA's failure to perform a nondiscretionary duty). EPA's delay is better understood as a continuing violation, which plaintiffs may challenge at any time provided the delay continues.[25] Yet, inasmuch as the surviving count seeks only to force agency action, it is duplicative of the CWA claim that survives in Count 6, since EPA has a nondiscretionary, mandatory duty either to approve or disapprove an initial CPP submitted to it

**24.** *Cf. Greater N.Y. Hosp. Ass'n v. Mathews,* 536 F.2d 494, 497 (2d Cir.1976) (holding that provision in Medicare Act requiring each "provider of services shall be paid at such time or times as the Secretary believes appropriate" rendered Secretary's decisions as to timing of these payments unreviewable, since the Act "sets forth no factors that the Secretary must consider or abide by in determining the timing of payments").

**25.** EPA argues that its alleged failure either to approve or disapprove the initial CPP is not reviewable because plaintiffs have never petitioned EPA for action under § 555(b) of the APA, and without a request for action, there can be no delay. EPA is correct that courts applying § 706(1) have often read it in conjunction with § 555(b)'s provision that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). Yet, it appears that courts have so held simply because § 555(b) provides the general rule for the time in which agency action must proceed, while § 706(1) provides review for violation of that rule. In this instance, plaintiffs do not need to rely on § 555(b)'s default rule that agencies conclude matters presented to them within a reasonable time, since the CWA itself provides clear and specific time limits for agency action that are in no way linked to plaintiffs' petitioning of the agency. Thus, § 555(b) and its requirements are not relevant to plaintiffs' § 706(1) claim.

by a state within 30 days and plaintiffs here have sued to enforce that duty under the citizen suit provision of the CWA. Such a duplicative action may not be brought under the APA.[26] On the other hand, if count 9 seeks simultaneously to require EPA to approve or disapprove Virginia's initial CPP and to challenge any potential EPA approval of the CPP for abuse of discretion, it seeks judicial review of decisions that have not yet been made. No such review is possible until EPA has actually approved or disapproved Virginia's initial CPP.

For the foregoing reasons, count 9 must be dismissed in its entirety.

## X.

The tenth count of the complaint states that EPA's failure to provide notice and an opportunity for comment prior to its approval of Virginia's § 303(d) submissions, its approval of Virginia's TMDLs and TMDTLs (if EPA argues that it in fact has approved TMDLs and TMDTLs for Virginia), and its approval of Virginia's CPP (if such approval is alleged by EPA) contravenes the APA's procedural requirements for agency rule making.[27] EPA moves to dismiss this count on various grounds.

EPA contends that the portion of count 10 seeking review of EPA's failure to provide notice and an opportunity for comment prior to its approval of Virginia's 1996 § 303(d) list is moot given Virginia's recent submission of its 1998 § 303(d) list and EPA's partial approval and partial disapproval of that list. Count 10 asserts that EPA violated the APA through its failure to publish notice and solicit public comment prior to its approval of Virginia's 1996 § 303(d) submission. It is not clear from either party's papers whether such notice and opportunity for comment was provided prior to EPA's partial approval and partial disapproval of Virginia's 1998 § 303(d) list.[28] If EPA provided notice and opportunity for comment prior to its partial approval and partial disapproval of the 1998 § 303(d) list, that part of count 10 addressing the 1996 § 303(d) list may be mooted.[29] If EPA did not provide notice and an opportunity to comment prior to its partial approval and partial disapproval of Virginia's 1998 submission, this portion of count 10 challenging the same failure in regard to the 1996 list survives. In that case, count 10 challenges an action too brief in effect to be fully litigated prior to its expiration and to which there would be a reasonable expectation that the complaining party would be subjected again.[30] *See generally Kennedy v. Block*, 784 F.2d 1220, 1223 (4th Cir.1986). The order accompanying this memorandum opinion will set out a schedule for further briefing of this issue by the parties.

EPA also states that the portion of count 10 related to EPA's approval of Virginia's CPP is time-barred. As noted above, if EPA did approve the CPP submitted by Virginia in 1987 at any time in 1987 or the four and a half years that followed, plaintiffs are time-barred from challenging this approval as arbitrary and capricious, since the statute of limitations for actions challenging agency action under the APA is six years. Similarly, plaintiffs cannot challenge any procedural defects in EPA's approval of Virginia's CPP under the APA more than six years after the

---

**26.** *See supra* note 6.

**27.** The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). It requires that general notice of proposed rule making be published in the Federal Register, with certain specified exceptions, and that interested persons be given an opportunity to participate in the rule making through submission of written data, views, or arguments. 5 U.S.C. § 553(b), (c).

**28.** EPA has only submitted that as a result of its partial disapproval of the 1998 list it will solicit public comment on those waters that should be included in EPA's WQLS list through notice in the Federal Register. This does not speak to whether notice and opportunity to comment were provided *prior* to EPA's partial approval and partial disapproval of the 1998 list.

**29.** See the analysis set out in Part IV, *supra*.

**30.** The reasonableness of this expectation would, of course, be shown by the actual recurrence of the failure to provide notice and comment in the case of the 1998 list.

fact. Thus, this aspect of count 9 must be dismissed.[31]

▮ Finally, EPA argues that the portion of count 10 relating to EPA approval of TMDLs or TMDTLs for Virginia must be dismissed since plaintiffs have pointed to no TMDL or TMDTL actually approved by EPA and so have alleged no final agency action actually undertaken without the required notice and comment procedure. This part of count 10 was apparently included by plaintiffs in anticipation of a potential EPA response to counts 4 and 5—namely, that Virginia has in fact submitted and EPA has in fact approved various TMDLs and TMDTLs in the past twenty years—and is properly construed as a pleading in the alternative to these counts. Plaintiffs' failure to identify any specific TMDL or TMDTL to which they object stems from the fact that if EPA does eventually allege the existence of TMDLs or TMDTLs, the identity of these TMDLs and TMDTLs is currently a mystery. Indeed, properly understood, this is the gravamen of plaintiffs' complaint. It would be inappropriate at this stage to dismiss this aspect of count 10 when plaintiffs' lack of specific knowledge of individual TMDLs and TMDTLs flows directly from EPA's alleged failure to make proposed TMDLs and TMDTLs public. Thus, this portion of count 10 survives.

In summary, defendant's motion to dismiss count 10 must be granted in part, denied in part, and deferred in part pending further submissions by the parties.

## XI.

▮ Count 12 alleges that EPA failed to comply with the Endangered Species Act (ESA) before reviewing, approving, or promulgating WQLSs, TMDLs, or TMDTLs for Virginia and before approving or reviewing a CPP for Virginia and that these failures are reviewable under § 706(1) and (2)(A) of the APA. EPA correctly contends that review of these actions is not available under the APA since the ESA expressly provides an adequate remedy for plaintiffs' claims through its citizen suit provision.[32] APA's review provisions, on the other hand, apply only to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. As discussed above,[33] EPA is correct in its contention that the APA does not provide an avenue for duplicative review when a statute specifically sets out procedures for review of agency action, and so count 12 of the complaint must be dismissed.[34]

## XII.

In summary, EPA's motion to dismiss is granted as to counts 1, 5, 7, 8, 9, and 12, and these counts are dismissed. The motion is denied as to count 4, which survives. The motion is granted in part, as detailed above, as to counts 6 and 10, and the aspects of these counts specified above are dismissed. Final resolution of EPA's motion to dismiss counts 2, 3, and 10 is deferred pending further briefing on the mootness issue. An appropriate order shall enter.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

▮

---

**31.** Plaintiffs cite to *Natural Resources Defense Council v. Fox*, 909 F.Supp. 153, 159 (S.D.N.Y. 1995), in support of their argument that the CPP claim is not time-barred. *Fox*, however, discusses only the applicable statute of limitations for suits brought under the citizen suit provision of the Clean Water Act, and so is inapplicable in this APA action.

**32.** The ESA's citizen suit provision allows "any person [to] commence a civil suit on his own behalf to enjoin any person, including the United States ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

**33.** *See supra* note 6.

**34.** Plaintiffs respond that it is impossible to tell whether the citizen suit provision of the ESA will provide them with an adequate remedy because their claims are a matter of first impression under the ESA. This argument is specious: whether or not their claims will actually succeed, they clearly allege violations of the ESA and seek injunctive relief, and so are reviewable under the statute's citizen suit provision. "Adequate remedy" does not mean assured victory.