**AMERICAN CANOE ASSOCIATION, INC., and The American Littoral Society, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

No. CIV. A. 98–979–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 9, 2001.

**726**

David Gabriel Bookbinder, American Canoe Association Inc., Springfield, VA, for Plaintiffs.

Arthur Peabody, Jr., U.S. Attorney's Office, Alexandria, VA, David Ellis Evans, Christopher Donald Pomeroy, McGuire-Woods L.L.P., Richmond, VA, Stephen M.

Colangelo, Morrison & Foerster, L.L.P., McLean, VA, for Defendants.

### CORRECTED MEMORANDUM OPINION *

ELLIS, District Judge.

Plaintiffs American Canoe Association ("ACA") and The American Littoral Society ("ALS"), having won a favorable settlement of their citizens suit against the United States Environmental Protection Agency ("EPA")[1] under the Clean Water Act ("CWA"),[2] the Endangered Species Act ("ESA"),[3] and the Administrative Procedure Act ("APA"),[4] now seek attorneys' fees, costs, and expenses pursuant to the fee-shifting provisions of the CWA[5] and ESA.[6]

### I.

The facts and legal principles pertinent to this citizens suit are more fully set forth in an earlier memorandum opinion, that granted in part, denied in part, and deferred in part EPA's threshold motion to dismiss. *See American Canoe Ass'n v. EPA,* 30 F.Supp.2d 908, 911–14 (E.D.Va. 1998) (*"American Canoe I "*). Only a brief recapitulation of the facts and proceedings is necessary here.

Plaintiffs are two nonprofit membership organizations dedicated by charter to the preservation and protection of American

* This Corrected Memorandum Opinion reflects the granting in part of plaintiffs' motion to correct the Memorandum Opinion and Order dated March 13, 2001. *See American Canoe Ass'n v. EPA,* 138 F.Supp.2d 722 (E.D.Va. 2001); *see also American Canoe Ass'n v. EPA,* No. 98–979–A, Memorandum Opinion (E.D.Va. Mar. 13, 2001); *American Canoe Ass'n v. EPA,* No. 98–979–A, Order (E.D.Va. Mar. 13, 2001).

1. Plaintiffs' suit names three defendants: EPA; Carol Browner, Administrator of the EPA; and Bradley Campbell, Regional Administrator of Region III of the EPA. For purposes of brevity, defendants are collectively referred to herein as "EPA."

2. 33 U.S.C. § 1294 *et seq.*

3. 16 U.S.C. § 1531 *et seq.*

4. 5 U.S.C. § 551 *et seq.*

5. *See* 33 U.S.C. § 1365(d).

6. *See* 16 U.S.C. § 1540(g)(4).

waterways and surrounding environments. They sued EPA in July 1998 alleging that their members' aesthetic and recreational use of Virginia's rivers, streams, and coastlines had been harmed by EPA's failure to perform certain discretionary and nondiscretionary duties under the CWA and ESA, in conjunction with the APA.[7] Specifically, plaintiffs' twelve-count complaint alleged:

(1) that EPA violated a mandatory, nondiscretionary duty under CWA § 106 by making grants to Virginia in the absence of an adequate state program for monitoring and analyzing water quality (Count I);[8]

(2) that EPA violated CWA § 303(d)(2) by approving Virginia's allegedly inadequate 1996 § 303(d) list of water quality limited segments ("WQLSs") (Count II);[9]

(3) that EPA abused its discretion and therefore violated APA § 706(2)(A) and (C) and § 706(1) in approving Virginia's allegedly inadequate 1996 § 303(d) list of WQLSs (Count III);[10]

(4) that EPA failed to establish total maximum daily loads ("TMDLs") and total maximum daily thermal loads ("TMDTLs") for Virginia's waters, in violation of the CWA (Count IV);[11]

7. The Virginia Association of Municipal Wastewater Agencies ("VAMWA") was permitted to intervene in this matter pursuant to Fed.R.Civ.P. Rule 24(a) and (b). *See American Canoe Ass'n v. EPA*, No. 98–979–A (E.D.Va. Sept. 8, 1998) (order granting VAMWA's motion to intervene).

8. CWA § 106 forbids EPA from making any grant under the CWA to any state "which has not provided or is not carrying out as a part of its program the establishment and operation of appropriate devices, methods, systems, and procedures necessary to monitor, and to compile and analyze date on ... the quality of navigable waters." 33 U.S.C. § 1256(e)(1).

9. WQLSs are waters within a state's boundaries that do not meet, or are not expected to meet, the state's water quality standards even after the imposition of various enumerated controls and treatments. *See* 33 U.S.C. § 1313(d)(1). *See also American Canoe I*, 30 F.Supp.2d at 912–13. The CWA requires every state to identify and rank for priority of treatment such waters in a " § 303(d) submission," and EPA regulations require such submissions to identify impairment-causing pollutants, to identify waters targeted for total maximum daily load ("TMDL") development, and to provide documentation supporting the state's decision to include or not include waters on the § 303(d) list. *See* 33 U.S.C. § 1313(d)(1); 40 C.F.R. § 130.7; *American Canoe I*, 30 F.Supp.2d at 912–13. As noted in *American Canoe I*, EPA approved Virginia's 1996 § 303(d) submission of WQLSs, despite the fact that the submission (i) failed to identi-

fy all the impaired waters within Virginia; (ii) failed to identify all pollutants causing impairment of its WQLSs; (iii) failed to identify and prioritize each individual WQLS; (iv) failed to identify waters targeted for TMDL development in the next two years; and (v) disclosed that Virginia had not monitored and assessed all waters within the state. *See American Canoe I*, 30 F.Supp.2d at 913.

10. APA § 706(2) makes unlawful "agency action, findings, and conclusions" found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ...." 5 U.S.C. § 706(2). Section 706(1) provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

11. TMDLs and TMDTLs represent the highest level at which a pollutant may be "loaded" into a WQLS without violating water quality standards. TMDLs and TMDTLs must be established "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality" for all pollutants that prevent, or are expected to prevent, the achievement of water quality standards. 33 U.S.C. § 1313(d)(1)(C), (D); *see* 40 C.F.R. § 130.7(c)(1)(ii). The CWA imposes a schedule for TMDL and TMDTL submissions similar to that for WQLS submis-

(5) that EPA abused its discretion, and therefore violated the APA, in failing to establish TMDLs and TMDTLs for Virginia's waters (Count V); [12]

(6) that EPA failed to perform a mandatory, nondiscretionary duty under the CWA either to approve or disapprove Virginia's continuing planning process ("CPP") submission (Count VI); [13]

(7) that EPA failed to perform a mandatory, nondiscretionary duty under CWA § 303(e) to disapprove Virginia's proposed 1987 CPP (Count VII); [14]

(8) that EPA failed to perform a mandatory, nondiscretionary duty under the CWA to revoke Virginia's Title IV National Pollutant Discharge Elimination System ("NPDES") permitting authority in the absence of an approved CPP for Virginia (Count VIII); [15]

(9) that EPA's actions in Counts VI, VII, and VIII constitute either (a) an unlawful withholding and unreasonable delay of agency action or (b) an abuse of discretion not in accordance with the law, in violation of §§ 706(1) and 706(2)(a) of the APA (Count IX); [16]

(10) that EPA violated the APA's procedural requirements for agency rulemaking by failing to provide notice and an opportunity for comment prior to its approval of Virginia's § 303(d) submissions, its approval of Virginia's TMDLs and TMDTLs (if EPA argues that it in fact approved TMDLs and TMDTLs for Virginia), and its approval of Virginia's CPP (were such approval alleged by EPA) (Count X); [17]

(11) that by failing to consult with the Secretaries of Commerce and Interior before reviewing, approving, or promulgating WQLSs, TMDLs, or

---

sions. *See* 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(1). As noted in *American Canoe I*, in the nearly twenty years that elapsed since the 1979 deadline for Virginia's initial submission, Virginia never submitted a TMDL or TMDTL for any of its waters, and the EPA never established any TMDL or TMDTL for any of Virginia's waters. *See American Canoe I*, 30 F.Supp.2d at 913.

**12.** *See supra* note 10.

**13.** CWA § 303(d) requires each state to submit a CPP for meeting the CWA's requirements for EPA approval by February 17, 1973, and requires EPA to approve the submission within 30 days. *See* 33 U.S.C. § 1313(e). States are also required to resubmit CPPs "regularly," 40 C.F.R. § 130.10(b)(1), and EPA must review CPPs from "time to time" to ensure compliance with CWA requirements, 33 U.S.C. § 1313(2). Plaintiffs alleged, but EPA disputed, that Virginia did not file a CPP on or before February 17, 1973, and that Virginia did not do so until 1987. Moreover, plaintiffs alleged, but EPA disputed, that EPA did not approve or disapprove Virginia's 1987 submission, and that

EPA had never approved or disapproved any CPP for Virginia.

**14.** Section 303(e) provides that the Administrator "shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such state, which include, but are not limited to" various enumerated components. 33 U.S.C. § 1313(e)(3). Plaintiffs argued that since Virginia's 1987 CPP did not include several of the enumerated components, EPA had a nondiscretionary duty to disapprove it. *See American Canoe I*, 30 F.Supp.2d at 923–24.

**15.** *See* 33 U.S.C. § 1313(e)(2).

**16.** *See supra* note 10.

**17.** The APA requires that general notice of proposed rulemaking be published in the Federal Register, with certain specified exceptions, and that interested persons be given an opportunity to participate in the rulemaking through submission of written data, views, or arguments. *See* 5 U.S.C. § 553(b), (c).

TMDTLs for Virginia and before reviewing or approving a CPP for Virginia, EPA failed to comply with the requirements of the ESA (Count XI);[18] and, .

(12) that EPA's failure to comply with ESA requirements before reviewing, approving, or promulgating WQLSs, TMDLs, or TMDTLs for Virginia and before reviewing or approving a CPP for Virginia violated the APA (Count XII).[19]

Each of these counts corresponds to one or another feature of the comprehensive process established by the CWA and ESA for the purpose of ensuring that water quality standards are met and protected species preserved.[20] Plaintiffs sought a declaration that EPA had failed (i) to identify Virginia's most heavily polluted waters, (ii) to restore the physical, biological, and chemical integrity of those waters, in violation of the CWA, and (iii) to consult with the Secretary of the Interior or the Secretary of Commerce to ensure that EPA approval of various actions taken by Virginia pursuant to the CWA did not jeopardize any endangered or threatened species, in violation of the ESA. *See American Canoe I*, 30 F.Supp.2d at 911–12. And, plaintiffs sought injunctive relief to compel EPA to perform all of its CWA and ESA duties. *See id.*

Pursuant to EPA's threshold dismissal motion under Rules 12(b)(6) and 12(b)(1), Fed.R.Civ.P., significant portions of plaintiffs' complaint were dismissed. *See American Canoe I*, 30 F.Supp.2d at 927. Specifically, six counts—Counts I, V, VII, VIII, IX, and XII—were dismissed in their entirety.[21] Moreover, Counts VI and X

---

**18.** Section 7 of the ESA requires federal agencies to consult with the Secretary of Commerce and/or the Secretary of the Interior to ensure that any action authorized, funded, or carried out by a federal agency does not jeopardize any endangered or threatened species or adversely modify the species' critical habitat. *See* 16 U.S.C. § 1536(a)(2).

**19.** *See supra* note 10.

**20.** As noted in *American Canoe I*, "[t]he overall scheme for achieving [the goal of restoring and maintaining the chemical, physical, and biological integrity of the nation's waters] may be summarized" in the following way:

First, the CWA provides that states must establish water quality standards for all their waters. 33 U.S.C. § 1313(a)-(c). Next, states must assess their waters to see which waters fail to meet these water quality standards. 33 U.S.C. § 1313(d)(1). Based upon this assessment, the CWA requires states to determine the maximum amount of pollutants each body of water can receive and still meet water quality standards. *Id.* These calculations are the basis for the imposition of controls on the sources of pollution. 33 U.S.C. § 1311(b)(1)(C). When states fail to perform their duties adequately, EPA is generally required to perform them on the states' behalf. 33 U.S.C. § 1313(b), (d)(2).

*American Canoe I*, 30 F.Supp.2d at 912.

**21.** Count I was dismissed on the ground that plaintiffs lacked standing to bring such a claim. *See id.* at 914–15. Count V, which claimed an abuse of discretion by EPA under the APA, was dismissed as duplicative of plaintiffs' CWA claims in Count IV. *See id.* at 922–23. Count VII, alleging EPA's failure to perform a mandatory, nondiscretionary duty to disapprove Virginia's proposed 1987 CPP, was dismissed on the ground that, although it must be assumed that EPA had a nondiscretionary duty to approve a proposed CPP that meets the CWA's enumerated elements, there is no complementary duty to disapprove a CPP that does not meet those requirements. *See id.* at 923–24. Count VIII was dismissed for lack of subject matter jurisdiction, as the CWA vests jurisdiction over EPA determinations concerning state NPDES permit programs exclusively in the Courts of Appeals. *See id.* at 924. Count IX was dismissed on various grounds. *See id.* at 924–26. Finally, Count XII was dismissed as duplicative of plaintiffs' ESA claim in Count XI. *See id.* at 927.

were dismissed in part.[22] Accordingly, only the following claims survived dismissal: (1) Count II, which alleged that EPA violated CWA § 303(d)(2) by approving Virginia's allegedly inadequate 1996 WQLS submission; (2) Count III, which alleged that EPA abused its discretion, in violation of APA § 706(2)(A) and (C) and § 706(1), by approving Virginia's allegedly inadequate 1996 WQLS submission;[23] (3) Count IV, which alleged that EPA violated the CWA by failing to establish TMDLs and TMDTLs for Virginia's waters; (4) the portion of Count VI that alleged that EPA violated the CWA by never approving or disapproving a CPP for Virginia; (5) the portion of Count X relating to any alleged EPA approval of TMDLs or TMDTLs for Virginia and relating to whether EPA provided notice and an opportunity for comment prior to its approval of Virginia's 1996 § 303(d) submissions; and (6) Count XI, which alleged that EPA failed to comply with the ESA before reviewing, approving, or promulgating WQLSs, TMDLs, or TMDTLs for Virginia and before approving or reviewing a CPP for Virginia.

In June 1999, while cross-motions for summary judgment were pending, the parties settled this dispute. In essence, plaintiffs and EPA submitted a Settlement Agreement and a Consent Decree specifying a comprehensive eleven-year schedule for the establishment of TMDLs for several hundred enumerated waters in Virginia that, following a hearing, won court approval. *See American Canoe Ass'n, Inc. v. EPA*, 54 F.Supp.2d 621, 623 (E.D.Va. 1999) ("*American Canoe III*"). Under the terms of this settlement, EPA agreed, *inter alia*, to: (i) take specified steps in the development and establishment of Virginia's next § 303(d) list;[24] (ii) take certain steps within established deadlines for the development and establishment of TMDLs for all pollutants for which each

---

**22.** Count VI was dismissed insofar as it attempts to enforce a discretionary duty on EPA to review submitted CPPs from "time to time." *Id.* at 923. Count VI survived to the extent it alleged that EPA never initially approved or disapproved a CPP for Virginia, for the allegation raised an issue of fact not resolvable on a threshold dismissal motion. *See id.* Count X was dismissed as time-barred insofar as it challenged the fact that EPA approved, or procedural defects in any EPA approval of, Virginia's 1987 CPP. *See id.* at 926–27. However, Count X survived (i) to the extent that it challenged procedural defects in EPA's partial approval and partial disapproval of Virginia's 1998 § 303(d) list and (ii) insofar as it challenged procedural defects relating to EPA approval of TMDLs or TMDTLs for Virginia. *See id.*

**23.** EPA correctly notes that Counts II and III were found to be alternative causes of action. Count III survived dismissal, however, as plaintiffs had properly alleged an abuse of discretion by EPA in approving Virginia's 1996 § 303(d) list "in direct violation of its own imperatively phrased regulations." *Id.*

at 918–19. Moreover, Count II survived insofar as it would have been necessary, in the event plaintiffs prevailed on Count III, to require EPA to fulfill its duty, under CWA § 303(d)(2), to establish WQLSs for Virginia within 30 days of disapproval. *See id.* at 919. EPA also correctly points out that its mootness attack on Counts II and III was not reached in *American Canoe I*, as the matter required further briefing by the parties. *See id.* at 918.

**24.** EPA, for example, agreed to transmit to Virginia a list of waters and pollutants that it agreed must be considered by Virginia in developing the next § 303(d) list; to determine whether Virginia's next § 303(d) list in fact includes the listed waters and pollutants; to determine whether any omission of listed waters or pollutants requires either approval or disapproval of Virginia's next § 303(d) list; to provide specific explanations as to why a listed water or pollutant was rightly omitted from Virginia's next § 303(d) list; and categorize listed waters and pollutants for TMDL establishment.

WQLS is identified;[25] (iii) review, publish, and take appropriate action with regard to Virginia's CPP;[26] (iv) comply with the requirements of the ESA in taking any future action;[27] (v) evaluate and recommend improvements to Virginia's monitoring program; and (vi) comply with specified reporting requirements.

Pursuant to the settlement, EPA also agreed that plaintiffs were "entitled to reasonable fees and costs." *American Canoe Ass'n, Inc. v. EPA*, No. 98–979–A (E.D.Va. June 11, 1999) (Consent Decree). Plaintiffs accordingly filed an initial fee petition seeking (i) $495,348.00 in attorneys' fees for 2,272.33 hours worked in prosecuting all of their claims in the underlying litigation; (ii) an additional $33,731.00 in attorneys' fees for 177.80 hours spent preparing the fee petition; and (iii) $11,565.49 in costs, totaling $540,644.49. Thereafter, however, plaintiffs modified their fee peti-

tion on at least three occasions. Thus, their request for attorneys' fees for the underlying litigation (excluding costs) ranged from $495,348.00 in their original fee petition, to $454,640.10 in their Reply Brief,[28] to $453,696.10 in their "Corrected Reply Brief."[29] Indeed, it remains unclear precisely what plaintiffs' final fee figure is, as their calculations—even within the same document—have been inconsistent.[30] It appears, however, that, in the end, plaintiffs seek fees and costs totaling $498,992.59: (i) $453,696.10 in attorneys' fees for 2,268.63[31] hours worked in prosecuting all of their claims, as reported in their Corrected Reply Brief; (ii) an additional $33,731.00 in attorneys' fees for 177.90 hours spent preparing the fee petition, as reported in their original petition and in their Corrected Reply Brief; and (iii) $11,565.49 in costs, as reported in their original petition.

**25.** For instance, EPA agreed to establish TMDLs for specified waters and pollutants if Virginia fails to do so.

**26.** EPA, among other things, agreed to review whether Virginia's CPP is consistent with the CWA and EPA regulations; review and make recommendations with regard to the CPP's components, including the component regarding NPDES permits; and take appropriate action as provided under the CWA and accompanying regulations.

**27.** For example, EPA is obligated to request information from the U.S. Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS") as to whether any endangered or threatened species or critical habitat may be present in an area affected by any EPA action to approve or establish any § 303(d) list or any TMDL; to provide FWS and/or NMFS with copies of any § 303(d) list or TMDL; and to consider any timely written comments of FWS and/or NMFS before taking final action on any § 303(d) list or TMDL.

**28.** Plaintiffs modified their original request to this amount pursuant to their admission that they were not entitled to recover for time

spent opposing VAMWA's intervention and that they wrongly applied current, and not historic, rates in calculating their request.

**29.** This figure represents the result of plaintiffs' fee matrix calculation in their Corrected Reply Brief of attorneys' fees expended in the underlying suit. Plaintiffs, however, report elsewhere in their brief a total of $479,524.59 in attorneys' fees and costs, which results in a request of $434,228.10 in attorneys' fees for the underlying litigation after $33,731.00 in fee petition fees and $11,565.49 in costs are subtracted.

**30.** In their Corrected Reply Brief, for example, plaintiffs seek "an order requiring Defendants to pay $479,524.59 in attorneys fees and costs, plus amounts expended in defending this petition," although later in their brief they calculate their fees alone (exclusive of costs) to total $487,427.10—i.e., $453,696.10 in fees attributable to the main litigation and $33,731.00 in fees attributable to the fee petition. *See also supra* note 29.

**31.** Another minor mistake in plaintiffs' calculations resulted in a report of 2,269.13 in their Corrected Reply Brief.

## II.

■ Analysis of plaintiffs' fee petition must begin with the acknowledgment that the fee-shifting provisions of the CWA and ESA provide that "[t]he court, in issuing any final order in any action brought pursuant to [the applicable CWA or ESA section], may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d); *accord* 16 U.S.C. § 1540(g)(4). Thus, the two considerations relevant to determining a fee award under the CWA and the ESA are (i) whether the party seeking fees is a prevailing party or substantially prevailing party and (ii) whether the fees requested are reasonable. Here, there is no dispute that plaintiffs are prevailing parties; conclusive evidence of this is the nature and scope of the relief plaintiffs obtained through the settlement, which was "a catalytic, necessary [and] substantial factor in plaintiffs' attainment of the relief sought" [32] here and accordingly "alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff[s]." [33] Consistent with this, EPA acknowledges in both the Consent Decree and the Settlement Agreement that plaintiffs are entitled to reasonable attorneys' fees and costs.

Accordingly, the question presented is whether plaintiffs' fee request is reasonable. The legal principles dispositive of this question are well-settled. In this regard, "[t]he most useful starting point for determining the amount of a reasonable fee" is to determine the lodestar amount, or "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The ultimate determination of a fee request's reasonableness, however, must also be informed by "other considerations that may lead the district court to adjust the fee upward or downward," including the twelve *"Johnson"* factors. *Id.* at 434, 103 S.Ct. 1933; *see Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974). Specifically, "a district court's discretion must be guided, *inter alia,* by the following considerations in arriving at an appropriate award":

(1) the time and labor required to litigate the suit; (2) the novelty and difficulty of the questions presented by the lawsuit; (3) the skill required properly to perform the legal service; (4) the preclusion of other employment opportunities for the attorney due to the attorney's acceptance of the case; (5) the customary fee for such services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount in controversy involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the attorney's pro-

---

**32.** *Gerena–Valentin v. Koch,* 739 F.2d 755, 758–59 (2d Cir.1984).

**33.** *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). *See also Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.") (quotations omitted); *Atlantic States Legal Found., Inc. v. Onondaga Dep't of Drainage and Sanitation,* 899 F.Supp. 84, 87 (N.D.N.Y.1995) ("[E]ven when the litigation is settled, but nevertheless prompts a defendant to change his policies, a plaintiff may be said to have prevailed.").

fessional relationship with the client; and (2) awards in similar cases. *Trimper v. City of Norfolk,* 58 F.3d 68, 72 (4th Cir.1995); *see also Daly v. Hill,* 790 F.2d 1071, 1077–78 (4th Cir.1986); *Johnson,* 488 F.2d at 717–19. Where "a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief," however, the "crucial" consideration is the "overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. Ultimately, "[a]llowance and computation of an attorneys' fees award is 'within the judicial discretion of the trial judge, who has close and intimate knowledge of the efforts expended and the value of the services rendered.'" *Cook v. Andrews,* 7 F.Supp.2d 733, 734 (E.D.Va.1998) (quoting *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 (4th Cir.1978)). These principles, applied here, compel the conclusion that plaintiffs' claimed hours are excessive, but that EPA's suggested extensive reductions are similarly unwarranted.

## III.

Plaintiffs claim that the following table reflects the proper lodestar calculation for their fee petition:

| NAME | RATE | TIME PERIOD | HOUR | FEE |
|---|---|---|---|---|
| James May | $235.00 | Oct 1, 1997 to May 28, 1998 | 80.45 | $ 18,905.75 |
| | $240.00 | Jun 4, 1998 to May 29, 1999 | 732.76 | $175,862.40 |
| | $295.00 | Jun 1, 1999 to Jun 11, 1999 | 52.40 | $ 15,458.00 |
| | | TOTAL | 865.61 | $210,226.15 |
| David Bookbinder | $285.00 | Nov 15, 1997 to May 22, 1998 | 32.00 | $ 9,120.00 |
| | $290.00 | Jun 4, 1998 to May 28, 1999 | 396.25 | $114,912.50 |
| | $295.00 | Jun 1, 1999 to Jun 11, 1999 | 24.25 | $ 7,153.75 |
| | | TOTAL | 452.50 | $131,186.25 |
| James Stuhltrager | $ 85.00 | Mar 21, 1998 to Oct 23, 1998 | 185.42 | $ 15,760.70 |
| | $155.00 | Oct 29, 1998 to May 28, 1999 | 304.35 | $ 47,174.25 |
| | $155.00 | Jun 1, 1999 to Jun 11, 1999 | 16.50 | $ 2,557.50 |
| | | TOTAL | 506.27 | $ 65,492.45 |
| Dale Schmidt | $150.00 | | 30.25 | $ 4,537.50 |
| | | TOTAL | 30.25 | $ 4,537.50 |
| Wendy Carr | $290.00 | Jun 9, 1998 to Apr 23, 1999 | 25.75 | $ 7,467.50 |
| | $295.00 | Sep 1, 1999 to Sep 2, 1999 | 8.50 | $ 2,507.50 |
| | | TOTAL | 34.25 | $ 9,975.00 |
| Interns | $ 85.00 | | 355.75 | $ 30,238.75 |
| | | TOTAL | 355.75 | $ 30,238.75 |
| Regina Katz | $ 85.00 | | 24.00 | $ 2,040.00 |
| | | TOTAL | 24.00 | $ 2,040.00 |
| | | TOTAL | 2268.63 | $453,696.10 |

EPA attacks plaintiffs' claimed hours and costs on six grounds: (i) that sovereign immunity bars any recovery for any work on plaintiffs' APA claims, given that plaintiffs have sought recovery only pursuant to the CWA and the ESA; (ii) that plaintiffs should not recover for any time spent on discovery, as it was ordered that the case

was to be litigated on the administrative record; (iii) that plaintiffs should not recover for work expended on Counts I, II, VI, VII, and VIII, which were either entirely dismissed or dismissed in part, and which EPA argues are unsuccessful claims unrelated to the claims on which plaintiffs prevailed; (iv) that plaintiffs' claimed hourly rates are excessive and not representative of the prevailing market rate in the relevant legal community; (v) that plaintiffs have presented an improperly documented petition seeking an egregiously unreasonable award; and (vi) that plaintiffs' claimed hours are excessive given the nature of the case and plaintiffs' extensive experience in litigating four other TMDL cases. Thus, EPA claims that plaintiffs are entitled to no more than $125,000 in fees and costs; indeed, EPA suggests that an outright denial of fees may be appropriate here. Each objection is separately addressed.

### A. Sovereign Immunity

 It is well-settled that a court may not award attorneys' fees against the United States absent an express statutory authorization, and such authorizations must be construed strictly in favor of the government.[34] Here, plaintiffs seek attorneys' fees pursuant to the fee-shifting provisions of the CWA and the ESA, which authorize attorneys' fees only for actions brought "pursuant to" either the CWA and the ESA; neither provision authorizes the award of attorneys' fees for claims brought

under the APA or any other federal statute. 33 U.S.C. § 1365(d); *accord* 16 U.S.C. § 1540(g)(4). In this regard, and construing the language of the CWA and the ESA strictly in favor of the government, it is clear that plaintiffs' APA claims were not brought "pursuant to" either the CWA or the ESA. Plaintiffs, of course, could have sought to recover attorneys' fees for their APA claims under the Equal Access to Justice Act ("EAJA"), which provides for a more limited award of attorneys' fees for plaintiffs prevailing in certain circumstances, but they chose not to do so. *See* 28 U.S.C. §§ 2412(d)(1)(A)-(B), (d)(2)(A)(ii). Instead, plaintiffs seek recovery for fees and costs only under the CWA and the ESA.[35] Thus, they may not recover fees for their APA claims under the CWA and ESA fee-shifting provisions.

Accordingly, plaintiffs' claimed 2,268.63 hours must be reduced, as EPA urges, to the extent they include time spent on their APA causes of action ("APA claims")— namely: (i) Count III, which alleged that EPA acted arbitrarily and capriciously in violation of the APA by approving Virginia's allegedly inadequate 1996 § 303(d) list of WQLSs; (ii) Count V, which was dismissed as an alternative cause of action to Count IV because it alleged that EPA abused its discretion, in violation of the APA, by failing to establish TMDLs and TMDTLs for Virginia's waters; (iii) Count IX, which alleged that EPA's acts or omissions relating to Virginia's CPP submissions and Title IV NPDES permitting au-

---

34. *See Hensley,* 461 U.S. at 429, 103 S.Ct. 1933 ("[E]ach party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary."); *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 685, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) ("Except to the extent it has waived its immunity, the Government is immune from claims for attorney's fees."); *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("In analyzing

whether Congress has waived the immunity of the United States, we must construe waivers strictly in favor of the sovereign.").

35. Indeed, it appears that any recovery by plaintiffs under the EAJA would be time-barred, as plaintiffs filed their petition after the 30-day period prescribed by the EAJA for the filing fee petitions had expired. *See* 28 U.S.C. § 2412(d)(1)(B).

thority constituted an unlawful withholding and an unreasonable delay of agency action, or an abuse of discretion otherwise not in accordance with law; (iv) Count X, which alleged that EPA contravened the APA's procedural requirements by failing to provide notice and an opportunity to comment prior to any approval of Virginia's § 303(d) WQLS, TMDL and TMDTL, or CPP submissions; and (v) Count XII, which was dismissed as duplicative of Count XI because it alleged an abuse of discretion in EPA's failure to comply with the ESA before taking action on any Virginia § 303(d) WQLS, TMDLS and TMDTL, or CPP submissions.

■ The Fourth Circuit's decision in *National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir.1988), does not, contrary to plaintiffs' contention, compel a contrary conclusion. In *Hanson*, environmental groups successfully challenged the failure of the Army Corps of Engineers (the "Corps") to make a proper determination that two tracts of land were "wetlands" within the definition promulgated by EPA under the CWA. *See id.* at 315. The district court reviewed the Corps' decisions under the " 'arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law,' " standard set by the APA and concluded that the Corps failed to follow proper procedures in its determinations and failed "to meet [its] obligation under the CWA to make a reasoned decision." *National Wildlife Fed'n v. Hanson*, 623 F.Supp. 1539, 1544, 1547 (E.D.N.C.1985) (quoting 5 U.S.C. § 706(2)(A)). The court then awarded plaintiffs attorneys' fees under the CWA. *See Hanson*, 859 F.2d at 314–15. On appeal, the government attacked the district court's grant of fees under the CWA "because the court reviewed the Corps' wet-

lands determination under Administrative Procedure Act standards and that Act does not provide for attorneys' fees." *Id.* at 316. Nonetheless, the Fourth Circuit panel upheld the fee award, on the ground that "[t]he district court's review of the Corps' wetlands determination under APA standards was proper and did not alter the jurisdictional base of the court's judgment," which, of course, was the CWA. *Id.; see Hanson*, 623 F.Supp. at 1540 (noting that "[t]his action was brought under § 505 (citizens' suit provision) of the Clean Water Act"). Accordingly, *Hanson* stands only for the proposition that a plaintiff may recover attorneys' fees for claims that are jurisdictionally based on the CWA— i.e., CWA causes of action—even though such claims may be adjudicated under APA review standards. The claims in *Hanson* were filed as CWA claims and remained CWA claims despite the use of the APA review standard. Put differently, a court's use of the APA standard in reviewing a CWA claim does not transform that claim into an APA claim for fee-shifting purposes. Thus, *Hanson*, applied here, only compels the conclusion that plaintiffs are not barred from recovering attorneys' fees for their *CWA* and *ESA* claims, even though those claims were or would have been reviewed under APA standards. *See American Canoe Ass'n, Inc. v. EPA*, 46 F.Supp.2d 473, 475–76 (E.D.Va.1999) ("*American Canoe II*") (holding that because, "here, the statutes in issue provide for judicial review via citizen suit provisions, yet do not set forth a standard for that review, judicial review is limited to APA review on the administrative record"). Plaintiffs' APA claims, however, stand on a different footing: They were jurisdictionally based on the *APA*, and not the CWA or the ESA. Thus, *Hanson* is inapposite.[36] And, because

---

**36.** EPA also argues that Count II, which, although pled as a violation of CWA

plaintiffs do not—indeed, cannot—recover pursuant to the EAJA, they may not recover for their APA claims.[37]

The practical effect on the lodestar calculation of the bar on plaintiffs' recovery for their APA claims is limited, however, as all but Count X of plaintiffs' APA claims were analogues of their CWA and ESA claims.[38] Count II, for example, alleged that EPA violated CWA § 303(d)(2) by approving Virginia's allegedly inadequate 1996 § 303(d) list of WQLSs, while Count III alleged that this action constituted an abuse of discretion in violation of APA §§ 706(2)(A), (C), and 706(1). Count IV alleged that EPA's failure to establish TMDLs and TMDTLs for Virginia's waters violated the CWA, while Count V

alleged that this failure was an abuse of discretion reviewable under the APA—indeed, Count V was dismissed as duplicative of Count IV. *See American Canoe I,* 30 F.Supp.2d at 922–23. Similarly, Count XII was held to be duplicative of Count XI. Finally, Count IX alleged that EPA's failure to take certain actions with regard to Virginia's CPP submissions (if any)—actions alleged in Counts VI, VII, and VIII to be mandatory, nondiscretionary duties—constituted an unlawful withholding and an unreasonable delay of agency action, or an abuse of discretion in violation of the APA. In this regard, and in light of the comprehensive relief ultimately secured by plaintiffs on their non-APA claims,[39] EPA's suggested 40% reduction in claimed hours is excessive.[40] Neverthe-

§ 303(d)(2), was held essentially to be duplicative of plaintiffs' APA-based Count III and which survived only to the extent necessary to require EPA to fulfill a mandatory duty that would have arisen had plaintiffs prevailed on Count III, should be regarded as an APA claim for which plaintiffs may not recover attorneys' fees. As *Hanson* illustrates, however, the critical issue is whether Count II is jurisdictionally based on the CWA—in which case sovereign immunity does not bar recovery of attorneys' fees—or, instead, the APA—in which case plaintiffs could only recover under the EAJA. Count II was jurisdictionally based on the CWA; accordingly, plaintiffs are not precluded by sovereign immunity from recovering related attorneys' fees.

37. *See supra* note 35.

38. Count X alleged that EPA contravened the APA's procedural requirements for rulemaking by failing to provide notice and an opportunity to comment prior to its actions on any Virginia § 303(d), TMDL and TMDTL, and CPP submissions.

39. *See infra* notes 46–48 and accompanying text.

40. Indeed, plaintiffs persuasively note that 105 paragraphs of their complaint were devoted to the CWA and ESA claims at issue, while only 12 paragraphs were devoted to the analogue APA claims. Although it is true, as

EPA counters, that the APA claims incorporated by reference allegations made in the CWA and ESA claims, this fact only serves to emphasize the close connection between the CWA and ESA claims and the analogue APA claims.

EPA's proposed 40% cut is based on plaintiffs' intensive factual research on the state of Virginia's waters, which EPA attributes to plaintiffs' listing claims—namely, Counts II and III. As discussed above, however, plaintiffs are not precluded by sovereign immunity from recovering attorneys' fees for work on Count II, EPA's attempt to transform it into a claim jurisdictionally based on the APA notwithstanding. Accordingly, insofar as time spent on plaintiffs' factual research can fairly be attributed to Claim II, a CWA claim, it may not serve as the measure of the appropriate reduction attributable to plaintiffs' APA claims.

Yet, even were recovery of attorneys' fees under Count II held to be barred by sovereign immunity, plaintiffs' factual research can fairly be attributed to their other, non-APA claims, for, as discussed below, plaintiffs' individual claims were integral constituent parts of an organic suit relating to the state of Virginia's waters and EPA's failure to ameliorate this condition. *See infra* notes 41–44 and accompanying text. Thus, for example, plaintiffs' research supports not only Count II, which alleged that EPA violated CWA section

less, plaintiffs' submitted hours are too sparsely described to allow a particularized reduction; however, an across-the-board reduction of 10% is appropriate and reasonable, given that at least some of plaintiffs' claimed hours were undisputably devoted to the fee-ineligible APA claims, but that these hours would have constituted a relatively small proportion of plaintiffs' total work in prosecuting the entire suit. *Cf. Hensley*, 461 U.S. at 436, 103 S.Ct. 1933 ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment."); *Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 789–90, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (same).

### B. Discovery

█ EPA also argues that plaintiffs should not recover for *any* discovery-related work, as litigation in this case was limited to the administrative record pursuant to a protective order. *See American Canoe II*, 46 F.Supp.2d at 477. Plaintiffs persuasively argue, however, that EPA did not produce, or offer to produce, the administrative record in this case until after the beginning of formal discovery in the litigation. Plaintiffs served their notice of intent to sue on March 16, 1998, and the complaint on July 9, 1998, yet EPA did not provide notice of its intent to limit discovery to the administrative record until October 26, 1998, although formal discovery began in mid-October. Importantly, EPA did not produce the administrative record at all in three other TMDL cases in Pennsylvania, Delaware, and West Virginia—all of which were in EPA Region III. Thus, until EPA provided notice of its intent to produce the administrative record in late October, plaintiffs worked on their formal discovery, reasonably believing that the litigation would proceed accordingly.[41] In this regard, plaintiffs are entitled to recover for reasonable time spent on formal discovery. Yet, plaintiffs' claim of approximately 250 hours spent on discovery-related work, which includes roughly 92 hours spent through October 26, 1998; approximately 42 hours in additional "initial dis-

---

303(d)(2) in approving Virginia's allegedly inadequate 1996 section 303(d) list of WQLSs, but also Count IV, which alleged that EPA violated the CWA by failing to establish TMDLs and TMDTLs for Virginia's waters. It is clear that plaintiffs could have made such an allegation in good faith only after ascertaining whether Virginia's waters in fact required the establishment of TMDLs and/or TMDTLs. Indeed, as discussed more fully in *American Canoe I*, the identification of WQLSs is "the starting point for the CWS's pollution regulation process," including the establishment of TMDLs and TMDTLs for Virginia's impaired waters. *American Canoe I*, 30 F.Supp.2d at 912–13. Accordingly, EPA's suggested 40% cut for plaintiffs' APA claims is too severe and wrongly pigeonholes plaintiffs' factual research to APA fee ineligible claims. *Cf. Sierra Club v. Hankinson*, No. 1:94–cv–2501–MHS (N.D.Ga. Apr. 18, 1997) (order awarding attorneys' fees) (holding that "preliminary research was a necessary precursor to filing this case and that time spent conducting such research is compensable," because "this complex case in an untested area of law necessitated substantial preliminary research for full compliance with [Rule 11]").

Of course, whether plaintiffs may ultimately recover *all* claimed fees for this factual research, despite the fact that a significant portion of Count II was dismissed, is another question altogether. That question turns in part on whether the number of hours claimed for this task is reasonable. It also raises the issue of whether plaintiffs' dismissed claims are unrelated and unsuccessful claims. *See infra* notes 40–46 and accompanying text. For present purposes, however, it suffices to say that sovereign immunity does not preclude recovery for this time spent.

**41.** Indeed, from all appearances, EPA was also aggressively pursing its own formal discovery.

covery"; some 74 hours on "further factual discovery" after November 1998 (and after EPA produced the administrative record); and about 38 hours for "mootness and discovery hearing," is plainly excessive, given that many of plaintiffs' discovery requests were unwarranted, and that EPA was diligent in producing the administrative record after October 1998. The availability of the administrative record, for example, casts serious doubts as to whether 74 hours of "further factual discovery" were reasonably expended. Yet, as discussed above, plaintiffs' documentation is too anemic to permit a mathematically precise reduction of plaintiffs' claimed hours. Accordingly, a 30% reduction from the discovery-related portion of plaintiffs' claimed hours is reasonably necessary to trim away such obvious excesses from plaintiffs' claimed hours. *Cf. Hensley*, 461 U.S. at 436, 103 S.Ct. 1933; *Texas State Teachers Ass'n*, 489 U.S. at 789–90, 109 S.Ct. 1486 (1989).

### C. Unrelated and Unsuccessful Claims

EPA also argues that the lodestar hours should not include work expended on five counts of plaintiffs' complaint that were either entirely dismissed or dismissed in part—namely: (i) Count I, which alleged that EPA had a mandatory, nondiscretionary duty to withhold CWA § 106(c) grants from Virginia absent an adequate state program for monitoring and analyzing water quality; (ii) Count II, which alleged that EPA violated CWA § 303(d)(2) in approving Virginia's allegedly inadequate 1996 § 303(d) list of WQLSs; (iii) Counts VI and VII, which alleged that EPA failed to perform mandatory, nondiscretionary duties under the CWA to take certain action with regard to any Virginia CPP submissions;[42] and (iv) Count VIII, which alleged that EPA had a mandatory, nondiscretionary duty to revoke Virginia's Title IV NPDES permitting authority in the absence of an approved CPP for Virginia. These counts, EPA contends, were unsuccessful and unrelated to plaintiffs' TMDL and ESA claims, on which EPA concedes plaintiffs prevailed pursuant to the Consent Decree and Settlement Agreement. *See Hensley*, 461 U.S. at 434–37, 103 S.Ct. 1933. EPA's arguments, however, are unpersuasive.

 Neither party disputes that, as *Hensley* teaches, plaintiffs are not entitled to attorneys' fees for unsuccessful claims that are *unrelated* to the claims on which they succeeded, because where "a plaintiff ... present[s] in one lawsuit distinctly different claims for relief that are based on different facts and legal theories, .... work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' " *Hensley*, 461 U.S. at 434–35, 103 S.Ct. 1933 (quoting *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049, 1974 WL 180 (C.D.Cal.1974)). Also beyond dispute is *Hensley*'s teaching that plaintiffs are entitled to recover fees for unsuccessful claims that are substantially *related* to the claims on which plaintiffs succeeded, for "where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Hensley*, 461 U.S. 424, 440, 103 S.Ct. 1933 (1983). As the Supreme Court noted, in some cases,

the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted gener-

---

**42.** Count VI survived to the extent that it alleged that EPA never initially approved or disapproved a CPP for Virginia.

ally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.

*Id.* at 435, 103 S.Ct. 1933. Thus, because "[l]itigants in good faith may raise alternative grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee," it stands to reason that the focus in determining a reasonable fee award should be "on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435, 103 S.Ct. 1933. In this regard, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* Conversely, where the plaintiff "has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436, 103 S.Ct. 1933. These principles, applied here, compel the conclusion that plaintiffs did not "fail to prevail on claims that were unrelated to the claims on which [they] succeeded," and that plaintiffs "achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making the fee award," such that a further reduction of the lodestar figure for plaintiffs' dismissed

claims is not appropriate. *Id.* at 434, 103 S.Ct. 1933.

First, it cannot be gainsaid that plaintiffs' suit had but one goal: to redress EPA's failure to comply with the CWA's comprehensive and integrated scheme for "restor[ing] and maintain[ing] the chemical, physical, and biological integrity" of Virginia's waters in a manner consistent with the ESA's goals. This scheme, codified in CWA § 303, is composed of the three main constituent parts of identification,[43] analysis,[44] and implementation[45] that are interdependent, with each part critical to the ultimate achievement of the CWA's goals. *See American Canoe I*, 30 F.Supp.2d at 912–14. In this regard, each of plaintiffs' counts, which correspond to these component parts, are related, and inextricably intertwined with, the others and involve the same common nucleus of operative facts and legal theories.[46]

Second, the level of success achieved by plaintiffs through the Settlement Agreement and Consent Decree points persuasively to the conclusion that plaintiffs should be fully compensated for work attributable to their dismissed, non-APA claims. Plaintiffs sought relief in their complaint for the alleged failure of EPA to comply with the strictures of the CWA—that is, they sought relief for EPA's failure "to identify Virginia's most heavily polluted waters and restore the chemical, physi-

---

**43.** *See* 33 U.S.C. § 1313(d)(1) (requiring the identification of WQLSs).

**44.** *See* 33 U.S.C. § 1313(d)(1)(C)—(D) (requiring establishment of TMDLs and TMDTLs for WQLSs).

**45.** *See* 33 U.S.C. § 1313(e) (requiring development of CPPs for meeting the CWA's requirements).

**46.** Indeed, it is puzzling how EPA can argue, as it does, that plaintiffs' TMDL claims, on which EPA concedes plaintiffs prevailed, are unrelated to their WQLS listing claims and their CPP claims. WQLSs, for example, "are

the starting point for the CWA's pollution regulation process," identifying the very waters for which TMDLs and TMDTLs must be established. *American Canoe I*, 30 F.Supp.2d at 913. Moreover, TMDLs and TMDTLs established for impaired waters are ineffective unless CPPs are reviewed and developed to ensure that states are complying with the CWA's requirements. *See id.* at 913–14. An inquiry into a state or EPA's compliance with the CWA's requirements, therefore, necessarily involves the same common nucleus of facts relating to this integrated scheme.

cal, and biological integrity of those waters." *American Canoe I*, 30 F.Supp.2d at 912. Specifically, plaintiffs claimed relief for EPA's failure (i) to identify Virginia's impaired waters, (ii) to analyze the impairment of those waters and to establish acceptable pollutant-loading limits for those waters, and (iii) to help develop a plan for Virginia for restoring the conditions of those waters, in a manner consistent with the ESA. In the Consent Decree and Settlement Agreement, plaintiffs secured relief for each of these grounds.[47] In this regard, EPA's focus on the particular counts dismissed and on the counts that remained is misguided,[48] for it is precisely the "mathematical approach comparing the total number of issues in this case with those actually prevailed upon" that the Supreme Court rejected in *Hensley*. *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. Insofar as plaintiffs effectively secured complete relief for their allegation that Virginia and EPA failed to comply with the CWA's requirements, they are entitled to "a fully compensatory fee"—one not "reduced simply because [plaintiffs] failed to prevail on every contention raised in the lawsuit." *Id.*

### D. Hourly Rates

 Plaintiffs' claimed hourly rates must also be reduced before calculating the lodestar figure. It is well-settled that "[t]he community in which the court sits is the appropriate starting point for selecting the appropriate rate," unless services of like quality were not available in the locality where services are rendered, and the party choosing the attorney from elsewhere acted reasonably in making that choice.[49] Moreover, "current rates may not be used when computing attorneys fees to be paid by the government"; rather, only rates in effect at the time the claimed hours wee expended may be applied. *Hanson*, 859 F.2d at 318. That plaintiffs secured nonprofit legal services does not render the use of historic market rates inappropriate, however, for "fee awards for nonprofit legal service organizations should be based on prevailing mar-

---

47. For Count I, for example, which was founded on EPA's alleged failure to withhold grants under the CWA until Virginia developed an adequate monitoring program, plaintiffs secured from EPA a commitment to evaluate Virginia's water quality monitoring program to ensure that Virginia's program monitors and assesses all previously unassessed waters. As to Count II, which was founded on EPA's failure to disapprove Virginia's allegedly inadequate 1996 § 303(d) submission, plaintiffs secured from EPA a commitment (i) to transmit a list of putative WQLSs to Virginia; (ii) to review Virginia's next § 303(d) list in light of the transmitted list; (iii) to provide an explanation for that review; (iv) to take further steps in ensuring that appropriate WQLSs are brought under the purview of the Consent Decree; and (v) to take timely action in establishing the next § 303(d) list for Virginia.

48. EPA focuses, for example, on the fact that the Consent Decree awarded plaintiffs relief with respect to EPA's review of Virginia's ongoing revision of its *current* CPP, but did not afford Plaintiffs relief as to the alleged nonexistence of a *prior* Virginia CPP in Counts VI, VII, and VIII. Yet, plaintiffs sought more than declaratory relief as to the legality of EPA's actions under the CWA; rather, plaintiffs primarily sought an order to compel EPA to comply with the CWA's requirements, including, *inter alia*, disapproval of Virginia's CPP, revocation of Virginia's Title IV NPDES permitting authority until Virginia establishes a CPP consistent with the CWA, and annual review of Virginia's CPP. In this regard, insofar as the relief obtained by plaintiffs comports with the relief originally sought, EPA's tally of dismissed claims does not require the denial of fees for those claims. As the Supreme Court succinctly stated in *Hensley*, "The result is what matters." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933.

49. *Hanson*, 859 F.2d at 317; *see also Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

ket rates." *National Wildlife Fed'n v. Hanson*, 859 F.2d 313, 319 (4th Cir.1988); *see also Blum*, 465 U.S. 886, 895, 104 S.Ct. 1541 (1984) ("Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.").

Here, there is no dispute that the relevant community for plaintiffs' counsel, including paralegals and student attorneys, is Alexandria, Virginia, which is "[t]he community in which the court sits." *Hanson*, 859 F.2d at 317. Plaintiffs, however, rely on the so-called "*Laffey* Matrix" to determine the prevailing market rates for Alexandria, Virginia. The *Laffey* Matrix is a rate schedule established by the United States Department of Justice that establishes what the department believes to be a reasonable rate for corresponding legal experience in Washington, D.C.[50] The matrix applicable here, plaintiffs submit, is as follows:

**LAFFEY MATRIX FOR 1997–2000**

**(Hourly Rates for June 1–May 31)**

| EXPERIENCE | 1997–1998 | 1998–1999 | 1999–2000 |
|---|---|---|---|
| 20+ Years | $330.00 | $335.00 | $340.00 |
| 11–19 Years | $285.00 | $290.00 | $295.00 |
| 8–10 Years | $235.00 | $240.00 | $245.00 |
| 4–7 Years | $195.00 | $195.00 | $200.00 |
| 1–3 Years | $155.00 | $155.00 | $160.00 |
| Paralegals/Law Clerks | $ 85.00 | $ 85.00 | $ 90.00 |

Plaintiffs argue that the *Laffey* Matrix is the appropriate schedule of rates given

that Alexandria, Virginia, is located only 5 miles from downtown Washington, D.C., and is therefore in the same legal market.

Plaintiffs have failed to carry their burden of demonstrating that Washington, D.C., and Alexandria are in the same legal market and that the use of the *Laffey* Matrix here is appropriate. *See Cook*, 7 F.Supp.2d at 736; *Cooper v. Paychex*, No. 97–1645, 1998 WL 637274, at *13 (4th Cir. 1998) (noting that "[e]ven if the prevailing rate for senior partners in Washington, D.C. is well above $300.00 per hour, the prevailing rate may be somewhat lower in the suburbs of Washington, like Alexandria, Virginia"). In their fee petition, plaintiffs only offer the affidavit of Dale Schmidt, an Alexandria attorney who served as plaintiffs' local counsel in the matter. Schmidt specializes in tax estate planning and administration and graduated from law school 24 years ago. His hourly rate in 1998 and 1999 was $150.00. This evidence clearly fails to support plaintiffs' claim that the prevailing rates for Alexandria, Virginia, are reflected in the *Laffey* Matrix. Plaintiffs, in their Reply Brief, belatedly proffer the affidavit of Joe R. Reeder, the managing partner of a large law firm with offices both in Washington, D.C., and at Tysons Corner in McLean, Virginia, who avers that his firm's partner rates range between $300.00 and $500.00 per hour for both offices, and that his personal billing rate is $485.00 per hour. Yet, beyond the simple fact that McLean, Virginia, is not Alexandria, Virginia,[51] this

---

**50.** The origins of the term "*Laffey* matrix" are found in the District of Columbia case, *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C.1983), that first accepted such a rate schedule.

**51.** Indeed, even a cursory review of legal periodicals discloses the recent migration of large (high-priced) law firms from all over the country to the Tysons Corner—McLean "tech-

nology corridor"—an influx not seen in Alexandria. *See, e.g.,* Jennifer Bier, *Virginia Roars Ahead: Influx of Outside Firms Begins to Alter Landscape; Suburban Maryland Stays Quiet*, Legal Times, Oct. 23, 2000, at 55; Victoria M. Huber et al., *Jobs Beyond the Beltway: A Guide to Navigating the Shifting Landscape of Northern Virginia's Legal Marketplace*, Legal Times, June 5, 2000, at 46; Claudia MacLachlan, *High–Tech Gold Rush: Arrival of Sil-*

evidence does not suffice to establish that the prevailing market rates for Alexandria, Virginia, are those that plaintiffs use. *See Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir.1987) (holding that "the fee applicant must produce specific evidence of the 'prevailing market rates' in the relevant community for the type of work for which he seeks an award"). First, evidence of the rates charged by one large law firm with no offices in Alexandria, Virginia, does not demonstrate that those rates are the *prevailing* rates in Alexandria, where there do not appear to be law firm offices of similar size. Second, plaintiffs have offered no evidence whatever of rates charged by attorneys practicing environmental litigation; the evidence does not disclose whether either Schmidt or Reeder practices environmental litigation. Accordingly, the hourly rates reflected in the *Laffey* Matrix are inappropriate here. Rather, the following historic rate schedule is appropriate, based on the Court's knowledge and experience and consideration of the *Johnson* factors: [52]

| NAME | RATE | TIME PERIOD |
|---|---|---|
| James May | $200.00 | Oct 1, 1997 to May 28, 1998 |
| | $220.00 | Jun 4, 1998 to May 29, 1999 |
| | $240.00 | Jun 1, 1999 to Jun 11, 1999 |
| David Bookbinder | $200.00 | Nov 15, 1997 to May 22, 1998 |
| | $220.00 | Jun 4, 1998 to May 28, 1999 |
| | $240.00 | Jun 1, 1999 to Jun 11, 1999 |
| James Stuhltrager | $ 55.00 | Mar 21, 1998 to Oct 23, 1998 |
| | $ 70.00 | Oct 29, 1998 to May 28, 1999 |
| | $ 85.00 | Jun 1, 1999 to Jun 11, 1999 |

| NAME | RATE | TIME PERIOD |
|---|---|---|
| Dale Schmidt | $150.00 | |
| Wendy Carr | $220.00 | Jun 9, 1998 to Apr 23, 1999 |
| | $240.00 | Sep 1, 1999 to Sep 2, 1999 |
| Interns | $ 50.00 | |
| Regina Katz | $ 75.00 | |

Indeed, the Court is aware of competent counsel in Alexandria who were available to perform the services required of plaintiffs' counsel in this case for rates lower than both plaintiff's submitted *Laffey* rates for the District of Columbia and the rates ultimately to be awarded plaintiffs here. Nevertheless, because of the sophisticated representation that plaintiffs' counsel provided in this case, these local rates are appropriately increased to those listed above.

### E. Adequacy of Documentation and Reasonableness of Award Sought

EPA also argues that plaintiffs have presented an improperly documented petition seeking an egregiously unreasonable award. Specifically, EPA notes that plaintiffs have failed to identify work on specific claims, thus rendering it impossible to apportion plaintiffs' claimed hours among claims for which they may recover and claims for which they may not recover. In addition, EPA argues that plaintiffs have failed to exclude excessive and redundant hours, in violation of the Supreme Court's admonition in *Hensley* that fee petitioners exercise "billing judgment" in "exclud[ing] from a fee request hours that are excessive, redundant, or otherwise unneces-

---

*icon Valley Law Firms Puts D.C. Suburbs in Play,* Legal Times, Apr. 26, 1999, at 1.

**52.** The rate schedule adopted is roughly consistent with rates awarded in this division in the past. *See, e.g., O'Bryhim v. Reliance Standard Life Ins. Co.,* 997 F.Supp. 728, 734 (1998) (awarding rates of $150–$190 per hour in ERISA matter).

sary." *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.

It is well-settled that, where "the district court determines that ... unsuccessful claims ... were indeed unrelated to successful ones, the burden of showing which hours are recoverable for work on successful claims will of course rest with the fee applicant." *Landow*, 999 F.2d at 97 (quoting *Buffington v. Baltimore County*, 913 F.2d 113, 128 (4th Cir.1990)). In this regard, "the court is entitled to expect that the applicant's records will provide some guidance in identifying recoverable hours." *Id.* (quoting *Buffington*, 913 F.2d at 128). To that end, "the 'fee applicant ... should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims,'" in compliance with what the Fourth Circuit deemed to be "the appropriate tack a fee applicant should follow when seeking to recover attorneys' fees":

> First, the applicant must make every effort to submit time records which specifically allocate time spent on each claim. Second, those records should attempt to specifically describe the work which the fee applicant allocated to unsuccessful claims so as to assist the district court in determining the reasonableness of the fee request. In establishing these guidelines, we recognize that some claims may have such a common core of facts and legal theories so as to prevent any allocation of fees to the applicant's separate claims. However, we hereby admonish all parties that a blind adherence to this argument runs the risk of incurring a complete denial of fees.

*Id.* Failure of the fee application to meet these requirements and "request[ing] one lump sum so outrageously excessive it 'shock[s] the conscience of the court,'" should compel the district court, "in the proper exercise of its discretion, [to] deny the fee request in its entirety." *Id.* at 97–98 (quoting *Sun Publishing Co., Inc. v. Mecklenburg News, Inc.*, 823 F.2d 818, 819 (4th Cir.1987)).

 Mindful of the Supreme Court's recognition in *Hensley* "that there is no certain method of determining when claims are 'related' or 'unrelated'", and the instruction that "[p]laintiff's counsel ... is not required to record in great detail how each minute of his time was expended," although "at least counsel should identify the general subject matter of his time expenditures," the Court finds that plaintiffs' fee request is not so improperly documented or so egregiously unreasonable as to warrant a complete denial of recovery. *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. 1933. As discussed above, each of the claims in plaintiffs' complaint are properly treated as interrelated constituent parts of an integrated suit to enforce the CWA and ESA.[53] In this regard, and given that the Fourth Circuit's instructions in *Landow* were generally tailored to "weed out" work on unrelated, unsuccessful claims—and not to distinguish among claims that "have such a common core of facts and legal theories so as to prevent any allocation of fees to the applicant's separate claims"— EPA's objections have limited persuasive force. The 10% deduction described above for plaintiffs' APA claims is sufficient and reasonable.[54]

It is worth noting, however, that there are examples in plaintiffs' fee request where plaintiffs billed flatly incredible hours. For example, plaintiffs' original request contained entries that report attorneys as having worked 28.25–, 21.65–, and 21.4–hour days. *See* EPA Response, at 20

---

**53.** *See supra* notes 43–47 and accompanying text.

**54.** *See supra* notes 38–40 and accompanying text.

& n. 14. It would be an overstatement, however, to say that plaintiffs' fee petition, in general, and billing records, in particular are as egregious as those in *Landow*, so as to warrant a complete denial of recovery.[55] Plaintiffs have offered credible explanations for many of the accounting and reporting errors EPA has identified. Nonetheless, because there remain obviously excessive claimed hours in plaintiffs' fee petition, a further 10% reduction of the claimed recovery is appropriate.[56]

### F. Nature of Case and Plaintiffs' Prior Litigation Experience

■ Finally, EPA argues that, given plaintiffs' extensive experience in litigating four other TMDL cases, their claimed hours are excessive.[57] This argument is not compelling. The award is warranted in light of the following: (i) plaintiffs' suit presented sufficiently novel and difficult factual and legal questions; (ii) the matter required a significant degree of skill; (iii) prosecution of this case precluded other employment opportunities for plaintiffs' counsel; (iv) plaintiffs' counsel bore a significant risk of not recovering fees for work performed; (v) the matter involved significant time limitations; (vi) the case was sufficiently undesirable; (vii) counsel's longstanding professional relationships with plaintiffs; and (viii) the fees recovered in similar cases. *See Johnson*, 488 F.2d at 717–19.[58]

### G. Lodestar Calculation

For the foregoing reasons, the following lodestar calculation is appropriate:

---

**55.** In *Landow*, the plaintiff sought to recover $537,113 in fees and expenses for work performed in a suit for breach of contract and violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Civil Rights Act of 1866 ("CRA"), 42 U.S.C. §§ 1981, 1982, although it only prevailed on their breach of contract claim. *See Landow*, 999 F.2d at 93–95. Pretrial preparation and the five day bench trial in the case, however, was overwhelmingly devoted to the plaintiff's FHA and CRA claims, on which the plaintiff ultimately did not prevail. Nevertheless, the plaintiff submitted billing records that did not allocate fees attributable to each claim. The district court, moreover, found "plaintiff's submitted professional time estimates [to be] so grossly in excess of any realistic amount as to be unworthy of consideration, even as a starting point." *Id.* at 95. Ultimately, however, the district court awarded the plaintiff $20,000 in fees, although it noted that "if there are motions for attorneys' fees and expenses that should be disallowed in their entirety simply because of the outrageously excessive amount requested, the pending motion would fit the bill." *Id.* at 94–95. On appeal, the Fourth Circuit held that a complete denial of the award was justified in light of the plaintiff's "woefully inadequate time records, coupled with its failure to make a good faith effort to exclude fees attributable to unsuccessful claims." *Id.* at 97.

**56.** Both James May and James Stuhltrager, for example, repeatedly billed calls to the Natural Resources Defense Council ("NRDC") as client communication, although the NRDC was never a party to this litigation. Plaintiffs' billed phone calls, moreover, were excessive. *See infra* Part V. Yet other examples of excess are plaintiffs' claimed hours for work with an expert, even though the matter was ordered to proceed on the administrative record; plaintiffs' billed hours for the preparation of a press release; numerous time entries occurring after the entry of the Consent Decree; and billed hours for multiple attorneys to attend, but not argue or otherwise participate in, hearings.

**57.** EPA notes that plaintiffs have averred that they have extensive experience and success in complex environmental litigation, and that they filed four prior TMDL lawsuits following the basic template used in this case. Accordingly, EPA argues that plaintiffs should have been able to litigate this case far more efficiently than they have.

**58.** Indeed, EPA concedes that TMDL issues are, as the Court observed, "technically complex." *American Canoe III*, 54 F.Supp.2d at 623 (noting that the parties sensibly resolved "the technically complex and novel issues presented").

| NAME | RATE | TIME PERIOD | HOURS | FEE |
|------|------|-------------|-------|-----|
| James May | $200.00 | Oct 1, 1997 to May 28, 1998 | 80.45 | $ 16,090.00 |
| | $220.00 | Jun 4, 1998 to May 29, 1999 | 696.25 | $153,175.00 |
| | $240.00 | Jun 1, 1999 to Jun 11, 1999 | 52.40 | $ 12,576.00 |
| | | TOTAL | 829.10 | $181,841.00 |
| David Bookbinder | $200.00 | Nov 15, 1997 to May 22, 1998 | 32.00 | $ 6,400.00 |
| | $220.00 | Jun 4, 1998 to May 28, 1999 | 385.60 | $ 84,832.00 |
| | $240.00 | Jun 1, 1999 to Jun 11, 1999 | 24.25 | $ 5,820.00 |
| | | TOTAL | 441.85 | $ 97,052.00 |
| James Stuhltrager | $ 55.00 | Mar 21, 1998 to Oct 23, 1998 | 185.42 | $ 10,198.10 |
| | $ 70.00 | Oct 29, 1998 to May 28, 1999 | 277.72 | $ 19,440.40 |
| | $ 85.00 | Jun 1, 1999 to Jun 11, 1999 | 16.50 | $ 1,402.50 |
| | | TOTAL | 479.64 | $ 31,041.00 |
| Dale Schmidt | $150.00 | | 30.25 | $ 4,537.50 |
| | | TOTAL | 30.25 | $ 4,537.50 |
| Wendy Carr | $220.00 | Jun 9, 1998 to Apr 23, 1999 | 25.75 | $ 5,665.00 |
| | $240.00 | Sep 1, 1999 to Sep 2, 1999 | 8.50 | $ 2,040.00 |
| | | TOTAL | 34.25 | $ 7,705.00 |
| Interns | $ 50.00 | | 355.75 | $ 17,787.50 |
| | | TOTAL | 355.75 | $ 17,787.50 |
| Regina Katz | $ 75.00 | | 24.00 | $ 1,800.00 |
| | | TOTAL | 24.00 | $ 1,800.00 |
| | | NET | 2194.84 | $341,764.00 |
| | | APA Claim and *Johnson* Reduction (20%) | − 438.97 | $ − 68,352.80 |
| | | TOTAL | 1755.87 | $273,411.20 |

An award of $273,411.20 is "fully compensatory without producing a windfall," and is a reasonable fee under the CWA and the ESA. *Daly*, 790 F.2d at 1078; *see also Blum*, 465 U.S. at 893–94, 104 S.Ct. 1541.

## IV.

Plaintiffs have also petitioned for recovery of fees for work spent on preparing their fee petition.[59] In this regard, plaintiffs also use the *Laffey* matrix in requesting the following amounts:

| NAME | RATE | HOURS | FEE |
|------|------|-------|-----|
| James May | $290.00 | 28.00 | $ 8,120.00 |
| David Bookbinder | $290.00 | 10.05 | $ 2,914.50 |
| James Stuhltrager | $155.00 | 17.00 | $ 2,635.00 |
| Bonnie Dahl | $155.00 | 88.90 | $13,779.50 |
| Wendy Carr | $290.00 | 16.85 | $ 4,886.50 |
| Regina Katz | $ 85.00 | 17.00 | $ 1,445.00 |
| | | 177.80 | $33,780.50 |

EPA argues, however, that plaintiffs' claimed "fees for fees" are excessive, redundant, or otherwise unnecessary, and that plaintiffs should be awarded no more than $13,000 for work performed in preparing the fee request. Indeed, EPA contends that because plaintiffs have filed such an inappropriate fee petition, and because their attempts to correct it have wasted judicial and governmental re-

59. Plaintiffs do not seek recovery for time and expenses relating to the defense of their fee petition. Although plaintiffs in their papers indicated that they will submit their petition-defense fee request following oral argument, they did not do so.

sources, plaintiffs should not recover at all for their work on the fee petition.

 It is well-settled that reasonable time and expenses spent preparing a fee petition are compensable.[60] This is so because "the fee application is a necessary part of the award of attorney's fees."[61] As with a fee application for work performed on the merits of the case, however, a fee award for fee preparation work must be reasonable in the circumstances. *See, e.g., Commissioner v. Jean,* 496 U.S. 154, 163 n. 10, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation."); *Donovan v. CSEA Local Union 1000,* 784 F.2d 98, 106 (2d Cir.1986) ("If the original award is warranted, ... a

*reasonable* amount should be granted for time spent in applying for the award.") (emphasis added). Here, insofar as plaintiffs are not entitled to recover for their APA claims, a corresponding 10% reduction of their petition fee claim is also appropriate.[62] And, an additional reduction of 35% is warranted (i) for time spent on the portion of the fee petition requesting compensation for excessive discovery-related hours; (ii) in light of the fact that plaintiffs originally improperly sought fees for time spent opposing intervention by VAMWA; (iii) because plaintiffs originally used current, and not historical, rates; and (iv) because, despite claiming to have spent 177.80 hours in preparing the fee petition, plaintiffs have submitted a petition that is anemic in description and documentation.[63]

**60.** *Cf. Trimper,* 58 F.3d at 77 ("[T]ime spent defending entitlement to attorney's fees is properly compensable."); *Daly,* 790 F.2d at 1080 (same); *American Fed'n of Gov't Employees v. Federal Labor Relations Auth.,* 994 F.2d 20, 21 (D.C.Cir.1993) (noting that "the availability of 'fees for fees' is essential to carrying out Congress' goal in including the [fee-shifting] provision in the first place," and that "an award of 'fees for fees' is not merely a remote descendant of the underlying action from which it derives," but rather "is an integral aspect of the statutory scheme on which the underlying claim is based").

**61.** *Donovan v. CSEA Local Union 1000,* 784 F.2d 98, 106 (2d Cir.1986); *see also Prandini v. National Tea Co.,* 585 F.2d 47, 53 (3rd Cir.1978) ("If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased.... Such a result would not comport with the purpose behind most statutory fee authorizations, *viz,* the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies."); *Souza v. Southworth,* 564 F.2d 609, 614 (1st Cir.1977) (noting that the failure to allow fees for fees "would permit a deep pocket losing party to dissipate the incentive provided by an award

through recalcitrance and automatic appeals.").

**62.** *See supra* notes 38–40 and accompanying text.

**63.** Indeed, plaintiffs' petition, although encompassing three volumes, is largely composed of various printouts from computerized billing and expense-tracking programs. Given the availability of this technology, it was unreasonable for plaintiffs to have spent 177.80 hours in compiling and producing the fee petition. Moreover, given that attorneys have an ongoing obligation to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims," there simply is no reason for the compilation and production of a fee claim here to have taken more than one man-month in hours. *Landow,* 999 F.2d at 97. Although "[m]athematical precision is rarely achievable" when determining a reasonable fee award, an attorney's billing records and, accordingly, the fee petition itself should be sufficiently detailed so as to make it unnecessary to have "a full scale second trial"—with the result being that the attorneys' fee issue would become the proverbial tail that wags the dog—simply to determine the reasonableness of the fee claim. *Equal Employment Opportunity Com'n v. Nutri/System, Inc.,* 685 F.Supp. 568, 578 & n. 21 (E.D.Va.1988); *see Hensley,* 461 U.S. at 437, 103 S.Ct. 1933 ("A request for attorney's fees

Finally, plaintiffs' claimed hourly rates must also be adjusted to reflect the prevailing market rates for Alexandria, Virginia.[64] In this regard, plaintiffs' fees for fees petition must be adjusted as follows:

Finally, plaintiffs originally sought $11,565.49 in expenses as follows:

It is beyond dispute that plaintiffs are entitled to recover for reasonable costs and expenses incurred in prosecuting their claims.[65] Plaintiffs' claimed costs, however, are excessive and are improperly documented in many instances.[66] For example, as EPA points out, plaintiffs seek to recover $3,712.50 for the cost of retaining Jack Smith, an expert witness, who did not and would not have testified, as the case proceeded on the administrative record. *See*

*American Canoe II*, 46 F.Supp.2d at 477. In addition, plaintiffs claim travel expenses not only for James May, plaintiffs' co-lead counsel and who represented plaintiffs at every hearing, but also $90.00 for interns and $321.25 for James Stuhltrager.[67] Finally, plaintiffs' offer inadequate documentation for their claimed costs, which includes, among other things, phone calls of long duration to unknown numbers with no corresponding record on time sheets and an excessive number of phone calls between James May and David Bookbinder. Accordingly, plaintiffs' claimed costs of $11,565.49 must be reduced as follows:

For the foregoing reasons, plaintiffs are awarded $292,091.80 for attorneys' fees, costs, and expenses.

An appropriate Order shall issue.

---

should not result in a second major litigation.").

64. *See supra* notes 49–52 and accompanying text.

65. *See, e.g., LeBlanc–Sternberg*, 143 F.3d at 763 ("Attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.") (quotation omitted).

66. Plaintiffs provide receipts, for example, for certain meals, "donuts variety," pretzels, chewing gum, breath mints, and crackers, although there is no indication whether the consumption of these food items was in any way related to counsel's work in this case.

67. It also appears that plaintiffs improperly charged paralegal rates for the delivery of filings, requesting $85 per hour for the three hours spent delivering notices of motion, a summary judgment motion, and a revised summary judgment motion to the Court.